J-S56012-20

2022 PA Super 189

COMMONWEALTH OF PENNSYLVANIA : IN THE SUPERIOR COURT OF
                                        :           PENNSYLVANIA
                                          :
             v.                          :
                                          :
                                          :
MELVIN HOWARD                        :
                                          :
                Appellant           :     No. 2821 EDA 2019

Appeal from the PCRA Order Entered September 11, 2019
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s): CP-51-CR-0304271-1988

BEFORE: BENDER, P.J.E., KUNSELMAN, J., and PELLEGRINI, J.*

OPINION BY BENDER, P.J.E.:                       **FILED NOVEMBER 9, 2022**

      Appellant, Melvin Howard, appeals from the September 11, 2019 order dismissing, as untimely, his petition filed pursuant to the Post Conviction Relief Act ("PCRA"), 42 Pa.C.S. §§ 9541-9546. This Court originally affirmed that order by opinion filed on April 20, 2020, therein agreeing with PCRA court that Appellant had failed to demonstrate that the contents of a state government report on capital punishment constituted newly-discovered facts under Section 9545(b)(1)(ii) so as to excuse the untimeliness of his petition. However, our Supreme Court subsequently vacated our decision and remanded for this Court to apply its holding in **Commonwealth v. Small**, 238 A.3d 1267 (Pa. 2020) (disavowing the 'public record presumption' as violative of the plain text of Section 9545(b)(1)(ii)). **See Commonwealth v. Howard**, 249 A.3d 1229

---

* Retired Senior Judge assigned to the Superior Court.

(Pa. Super. 2021), *vacated and remanded*, 266 A.3d 1067 (Pa. 2021) (*per curiam* order). After careful reconsideration of our prior decision and **Small**, and for the reasons set forth herein, we again affirm the order dismissing Appellant's PCRA petition as untimely.

The facts underlying Appellant's conviction are not germane to this appeal. The PCRA court described the relevant procedural history of this case as follows:

> On September 14, 1989, a jury found [Appellant] guilty of first[-]degree murder and related charges in connection with the stabbing death of Clarence Woodlock. During the penalty phase, the jury returned a verdict of death for the murder. [Appellant] appealed this judgment of sentence; his sentence was affirmed by the Pennsylvania Supreme Court on August 8, 1994. **Commonwealth v. Howard**, 645 A.2d 1300 (Pa. 1994).
>
> On May 11, 1995, [Appellant] filed his first PCRA petition, raising several claims of ineffective assistance of counsel. This petition was dismissed by the PCRA court and subsequently affirmed by the Sup[reme] Court on October 1, 1998. **Commonwealth v. Howard**, 719 A.2d 233 (Pa. 1998). On July 17, 1999, he filed his second PCRA petition, claiming that the prosecutor's use of peremptory strikes during jury selection was racially discriminatory in violation of **Batson v. Kentucky**, 476 U.S. 79 (1986). This petition was dismissed as untimely on February 24, 2000. The Supreme Court affirmed the dismissal on January 22, 2002. **Commonwealth v. Howard**, 788 A.2d 351 (Pa. 2002).
>
> On September 16, 2011, by agreement between the parties, the Honorable Carolyn Temin vacated [Appellant]'s death sentence and resentenced him to life imprisonment without the possibility of parole.[1]

_____

[1] Appellant adds that:

*(Footnote Continued Next Page)*

On August 23, 2018, [Appellant] filed his third PCRA petition, the matter before this [c]ourt. [Appellant] is represented by Ayanna Williams, Esquire[,] of the Federal Community Defender Office for the Eastern District of Pennsylvania. In his petition, [Appellant] alleges a **Batson** violation based upon the findings of the [2018 Joint State Government Commission Report on Capital Punishment ("JSGC Report")]. He claims that the commission's findings on jury selection in capital cases is a newly-discovered fact that allows him to overcome the time bar. On May 3, 2019, the Commonwealth filed its Motion to Dismiss. On May 21, 2019, [Appellant] replied to the Commonwealth's Motion to Dismiss. On August 6, 2019, this [c]ourt sent [Appellant] a Notice of Intent [to Dismiss the Petition without a hearing] [p]ursuant to [Pa.R.Crim.P.] 907. On August 26, 2019, [Appellant] replied to the [Rule] 907 Notice. On September 11, 2019, this [c]ourt dismissed [Appellant]'s petition as untimely and without merit. On October 2, 2019, [Appellant] appealed this dismissal to the Superior Court.

PCRA Court Opinion ("PCO"), 6/30/20, at 2-3. The PCRA court did not order

Appellant to file a Pa.R.A.P. 1925(b) statement, and Appellant did not file one.

The court issued its Rule 1925(a) opinion on June 30, 2020.

---

While the second PCRA petition was pending, [Appellant] filed a Petition for a Writ of *Habeas Corpus* in the United States District Court for the Eastern District of Pennsylvania. The District Court held the federal proceedings in suspense pending the exhaustion of [Appellant]'s claim that, in light of **Atkins v. Virginia**, 536 U.S. 304 (2001) [(prohibiting the execution of inmates with severe mental disabilities)], his death sentence was unconstitutional. On September 16, 2011, … [Judge] Temin…, by agreement of the parties, vacated Appellant's death sentence and resentenced [him] to life in prison without the possibility of parole.

Appellant's Post-Remand Brief at 3. Our review of the January 28, 2011 hearing addressing Appellant's **Atkins** claim, and the September 15, 2011 resentencing hearing, indicates that Appellant either met the criteria for relief under **Atkins** due to severe mental impairment, or that the Commonwealth declined to oppose that claim after conducting its own investigation. **See** N.T., 1/28/11, at 1-10.

- 3 -

Appellant previously presented the following questions for our review:

I. Did the court below err in concluding that the claims raised in [Appellant]'s successor PCRA petition were untimely under 42 Pa.C.S. § 9545(b), where the newly[-]discovered evidence included admissions from the [JSGC Report] regarding racial disparities in jury selection?

II. Did the court below err in denying a new trial where [Appellant] pled and proved that racial discrimination during jury selection violated his rights to a jury of his peers and to be free from cruel punishments under Article I, Sections 6 and 13 of the Pennsylvania Constitution?

Appellant's Pre-Remand Brief at 2.

In our prior Opinion, we did not reach Appellant's second question, having concluded that the JSGC Report did not meet the criteria for a newly-discovered fact under Section 9545(b)(1)(ii), because there was "no revelation in the JSGC Report of a specific error in Appellant's case, an admission of such an error by the prosecutor or the District Attorney's office, nor an admission of a systemic error that necessarily impacted Appellant's case." *Howard*, 249 A.3d at 1239. In its *per curiam* order vacating our decision, the Supreme Court did not explain its rationale for remanding in light of *Small*. Although this Court did not explicitly rely on the public record presumption in affirming the PCRA court's order denying relief, Justice Dougherty, in a concurring statement joined by Justice Mundy, explained that there were "stray statements" in our decision, including block-quoted portions of the PCRA court's Rule 1925(a) opinion, "that could arguably be interpreted as conflicting with the holding in *Small*[,]" and that this Court had expressed

its agreement with those block quotes without qualification. *Howard*, 266 A.3d at 1069–70 (Dougherty, J., concurring).[2]

Upon remand, we granted Appellant's unopposed motion for supplemental briefing on January 28, 2022. Appellant now presents the following questions for our review:

> I. Is remand to the [PCRA court] appropriate where the Pennsylvania Supreme Court has directed that this PCRA petition be analyzed under … *Small*[], and where the [PCRA court] has not yet had an opportunity to do so?
>
> II. Did the [PCRA court] err in concluding that the claims raised in [Appellant]'s … [PCRA] petition were untimely under 42 Pa.C.S. § 9545(b), where the new facts included recent findings from the [JSGC] regarding racial discrimination in jury selection?
>
> III. Did the [PCRA court] err in considering [Appellant]'s claims on the merits after determining that it lacked jurisdiction?
>
> IV. Did the [PCRA court] err in denying the PCRA petition on the merits where [Appellant] showed that racial discrimination during jury selection violated his rights under Article I, Sections 6 and 13 of the Pennsylvania Constitution?

Appellant's Post-Remand Brief at 2.

As noted above, the Supreme Court of Pennsylvania has directed this Court to reconsider, in light of *Small*, our decision affirming the denial of Appellant's PCRA petition as untimely. In general, we review "an order dismissing or denying a PCRA petition" as to "whether the findings of the PCRA

---

[2] Justice Dougherty further opined that he did not believe our decision "intended to" violate, nor "actually" violated the holding in *Small*, but he believed a remand to this Court was appropriate because "it could appear" that this Court had "endorsed statements by the PCRA court regarding the now-defunct public record presumption[.]" *Id.* at 1070 (Dougherty, J., concurring).

court are supported by the record and are free from legal error." ***Commonwealth v. Reid***, 259 A.3d 395, 405–06 (Pa. 2021). Appellant "has the burden to persuade this Court that the PCRA court erred and that such error requires relief." ***Commonwealth v. Wholaver***, 177 A.3d 136, 144–45 (Pa. 2018).

As to legal questions, "we apply a *de novo* standard of review to the PCRA court's legal conclusions[,]" ***Commonwealth v. Roney***, 79 A.3d 595, 603 (Pa. 2013), and this Court "may affirm a PCRA court's order on any legal basis." ***Commonwealth v. Parker***, 249 A.3d 590, 595 (Pa. Super. 2021). As to factual questions, "our scope of review is limited to the findings of the PCRA court and the evidence of record, viewed in the light most favorable to the prevailing party" in the lower court. ***Commonwealth v. Burkett***, 5 A.3d 1260, 1267 (Pa. Super. 2010). "Great deference is granted to the findings of the PCRA court, and these findings will not be disturbed unless they have no support in the certified record." ***Commonwealth v. Daniels***, 947 A.2d 795, 798 (Pa. Super. 2008).

Here, the PCRA court denied Appellant's petition as untimely, and the PCRA's time limitations implicate our jurisdiction and may not be altered or disregarded in order to address the merits of a petition. ***See Commonwealth v. Bennett***, 930 A.2d 1264, 1267 (Pa. 2007). Under the PCRA, any petition for post-conviction relief, including a second or subsequent one, must be filed within one year of the date the judgment of sentence becomes final, unless

one of the following exceptions set forth in 42 Pa.C.S. § 9545(b)(1)(i)-(iii)

applies:

> **(b) Time for filing petition.--**
>
> > (1) Any petition under this subchapter, including a second or subsequent petition, shall be filed within one year of the date the judgment becomes final, unless the petition alleges and the petitioner proves that:
> >
> > > (i) the failure to raise the claim previously was the result of interference by government officials with the presentation of the claim in violation of the Constitution or laws of this Commonwealth or the Constitution or laws of the United States;
> > >
> > > (ii) the facts upon which the claim is predicated were unknown to the petitioner and could not have been ascertained by the exercise of due diligence; or
> > >
> > > (iii) the right asserted is a constitutional right that was recognized by the Supreme Court of the United States or the Supreme Court of Pennsylvania after the time period provided in this section and has been held by that court to apply retroactively.

42 Pa.C.S. § 9545(b)(1)(i)-(iii). Additionally, Section 9545(b)(2) requires that

any petition attempting to invoke one of these exceptions "be filed within one

year of the date the claim could have been presented." 42 Pa.C.S. §

9545(b)(2).

In his second issue, Appellant argues that the trial court erred in

dismissing his PCRA petition as untimely, contending that his discovery of the

JSGC Report and its contents constitute new facts that excuse the

untimeliness of his petition under Section 9545(b)(1)(ii). Relatedly, in his first

issue, Appellant advocates that we remand to the PCRA court so that it can

reconsider his petition in light of *Small*, after holding a hearing to consider Appellant's factual averments regarding his knowledge of, and due diligence in, discovering the new facts alleged. For ease of disposition, we start our analysis with Appellant's second claim.

In his pre-remand brief, Appellant described the new facts as follows:

Prompted by troubling reports from the American Bar Association … and the Pennsylvania Supreme Court's Committee on Racial and Gender Bias in the Justice System…, the Pennsylvania Senate directed the JSGC "to conduct a study on capital punishment in this Commonwealth," covering eighteen specific topics and problems. Pa. Sen. Res. 6 at 2-6 (Dec. 6, 2011). On June 25, 2018, the JSGC issued its report entitled "Capital Punishment in Pennsylvania: The Report of the Task Force and Advisory Committee."[3]

The JSGC Report revealed that racial disparities in jury selection pervasively and persistently infected the Commonwealth's capital prosecution system and that Pennsylvania should adopt structural and procedural reforms to address such defects. [Appellant]'s petition for PCRA and *habeas* relief, which raised constitutional violations arising from discriminatory jury selection practices in capital prosecutions, was filed within sixty days of the publication of the JSGC Report.

Appellant's Pre-Remand Brief at 4 (footnote omitted). He further argued that:

The discriminatory exercise of peremptory challenges against black prospective jurors in [Appellant]'s case was consistent with the systematic racial discrimination in jury selection identified in the JSGC Report. The prosecutor in [Appellant]'s case struck 1.5 times as many black prospective jurors as white, which is statistically significant. The intentional and pervasive practice of race discrimination infringed on [Appellant]'s rights to be tried by a jury that was representative of the community and subjected

---

[3] As of the date of the filing of this decision, the JSGC Report can be found at http://jsg.legis.state.pa.us/publications.cfm?JSPU_PUBLN_ID=472.

him to a cruel punishment, in violation of Pennsylvania's Constitution.

*Id.* at 42.

In his post-remand brief, Appellant further maintains that:

Most relevant to [Appellant]'s instant petition, the JSGC Report found that "the death qualification process systematically eliminates jurors who belong to certain social and demographic groups and can also change the way in which case facts are interpreted and discussed by a jury." [JSGC Report] at 11 (quotations omitted). Death qualification skews jury composition "in ways that consistently disadvantage capital defendants." *Id.* at 26. The report recommended a number of structural reforms, including the "enactment of a Racial Justice Act to statutorily allow death sentences to be challenged on a statistical basis," *i.e.*, without necessarily establishing purposeful, conscious discrimination. *Id.* at 12, 31.

Appellant's Post-Remand Brief at 10.

Appellant filed the petition under review on August 23, 2018, "within sixty days of the publication of the JSGC Report[.]" *Id.* at 11. Appellant avers that he

did not know, prior to the JSGC Report, that "the death qualification process systematically eliminates jurors who belong to certain social and demographic groups," which in turn, "change[s] the way in which case facts are interpreted and discussed by a jury." JSGC Report [at] 11. Nor did [Appellant] know that the commission would recommend a new procedure for granting relief in cases, like his own, that involve racial disparities. *Id.* at 12, 31. [Appellant] could neither have learned these facts through due diligence nor anticipated that the JSGC would have found such systematic defects in the jury selection process in Pennsylvania capital cases. [Appellant] therefore meets the timeliness standard under [Section] 9545(b)(1)(ii).

Appellant's Post-Remand Brief at 12. As the PCRA court declined to hold a hearing, it made no factual findings regarding Appellant's averments that

these ostensible new facts were not previously known to him and that he could

not have ascertained those facts at an earlier time.

As this Court has previously stated:

The timeliness exception set forth in Section 9545(b)(1)(ii) requires a petitioner to demonstrate he did not know the facts upon which he based his petition and could not have learned those facts earlier by the exercise of due diligence. **Commonwealth v. Bennett**, 930 A.2d 1264, 1271 (Pa. 2007). Due diligence demands that the petitioner take reasonable steps to protect his own interests. **Commonwealth v. Carr**, 768 A.2d 1164, 1168 (Pa. Super. 2001). A petitioner must explain why he could not have learned the new fact(s) earlier with the exercise of due diligence. **Commonwealth v. Breakiron**, 781 A.2d 94, 98 (Pa. 2001); **Commonwealth v. Monaco**, 996 A.2d 1076, 1080 (Pa. Super. 2010)…. This rule is strictly enforced. **Id.** Additionally, the focus of this exception "is on the newly[-]discovered facts, not on a newly[-]discovered or newly[-]willing source for previously known facts." **Commonwealth v. Marshall**, 947 A.2d 714, 720 (Pa. 2008)….

The timeliness exception set forth at Section 9545(b)(1)(ii) has often mistakenly been referred to as the "after-discovered evidence" exception. **Bennett**, **supra** at … 1270. "This shorthand reference was a misnomer, since the plain language of subsection (b)(1)(ii) does not require the petitioner to allege and prove a claim of 'after-discovered evidence.'" **Id.** Rather, as an initial jurisdictional threshold, Section 9545(b)(1)(ii) requires a petitioner to allege and prove that there were facts unknown to him and that he exercised due diligence in discovering those facts. **See** 42 Pa.C.S. § 9545(b)(1)(ii); **Bennett**, **supra**. Once jurisdiction is established, a PCRA petitioner can present a substantive after-discovered-evidence claim. **See** 42 Pa.C.S. § 9543(a)(2)(vi) (explaining that to be eligible for relief under PCRA, petitioner must plead and prove by preponderance of evidence that conviction or sentence resulted from, *inter alia*, unavailability at time of trial of exculpatory evidence that has subsequently become available and would have changed outcome of trial if it had been introduced). In other words[:]

[S]ubsection (b)(1)(ii) has two components, which must be alleged and proved. Namely, the petitioner must establish

- 10 -

that: 1) the **facts** upon which the claim was predicated were **unknown** and 2) could not have been ascertained by the exercise of **due diligence**. If the petitioner alleges and proves these two components, then the PCRA court has jurisdiction over the claim under this subsection.

**Bennett**, … 930 A.2d at 1272 (internal citations omitted) (emphasis in original). Thus, the "new facts" exception at Section 9545(b)(1)(ii) does not require any merits analysis of an underlying after-discovered-evidence claim. **Id.** at … 1271.

**Commonwealth v. Brown**, 111 A.3d 171, 176–77 (Pa. Super. 2015) (some citations reformatted; footnote omitted).

Appellant argues that the PCRA court's reasoning for deeming his PCRA petition untimely was undoubtably grounded in the now-defunct public record presumption. The PCRA court determined that Appellant could not invoke the newly-discovered evidence exception set forth in Section 9545(b)(1)(ii) because its

review of the JSGC [R]eport shows that the underlying data used to perform the statistical analysis was not new and was part of the public domain before the report's release. Since the underlying data was known and available to the public for years prior to the report's release, and [Appellant] has been represented by counsel so the *pro se* defendant exception does not apply, this report cannot be considered a newly-discovered fact for purposes of overcoming the time bar.

PCO at 8. In light of **Small**, this rationale for deeming Appellant's petition untimely without exception is unsustainable.

The public record presumption generally held that information available in the public record could not be deemed 'unknown to the petitioner' for purposes of the timeliness exception set forth in Section 9545(b)(1)(ii). **See Commonwealth v. Burton**, 158 A.3d 618, 624–25 (Pa. 2017) (compiling

- 11 -

cases applying the public record presumption).   The presumption originated in ***Commonwealth v. Lark***, 746 A.2d 585, 588 (Pa. 2000), *overruled by* ***Small***, with a "two-sentence discussion, relegated to a footnote" that "did not address the relevant statutory language" of Section 9545(b)(1)(ii).  ***Burton***, 158 A.3d at 632.   Citing that footnote from ***Lark***, the public record presumption was later applied by our Supreme Court in cases such as ***Commonwealth v. Whitney***, 817 A.2d 473, 478 (Pa. 2003) (holding that a study of the criminal justice system did not constitute newly-discovered evidence under Section 9545(b)(1)(ii) where the underlying statistics were part of the public record), *overruled by* ***Small***, 238 A.3d at 1286 n.12, and ***Commonwealth v. Chester***, 895 A.2d 520, 523 (Pa. 2006) (holding evidence of an arrest was not 'unknown' to the petitioner because it was a matter of public record), *overruled by* ***Small***, 238 A.3d at 1286 n.12.

The resiliency of the public record presumption was first questioned in ***Bennett***.  Bennett had argued that his discovery of the dismissal of his prior appeal (due to his prior counsel's failure to file a brief) was a newly-discovered fact for purposes of Section 9545(b)(1)(ii), even though the dismissal of his appeal had been a matter of public record for some time.  ***Bennett***, 930 A.2d at 1274.  Distinguishing the matter from the circumstances in ***Chester***, the ***Bennett*** Court determined that it was "illogical to believe that a counsel that abandons his or her client for a requested appeal will inform his client that his case has been dismissed because of his own failures" and, "in light of the fact that counsel abandoned" his incarcerated client, there was "no other way in

which a prisoner could access" the public record that revealed that the appeal had been dismissed. *Id.* at 1275. Thus, in **Bennett**, the Supreme Court began to recognize cracks in the logic underlying the public record presumption, particularly with respect to incarcerated, *pro se* litigants.

Those cracks widened in **Burton**, wherein our Supreme Court categorically rejected the application of the public record presumption to incarcerated, *pro se* litigants. **Burton**, 158 A.3d at 638 (holding that "the presumption that information which is of public record cannot be deemed 'unknown' for purposes of subsection 9545(b)(1)(ii) does not apply to *pro se* prisoner petitioners"). In 1993, Burton was convicted of first-degree murder in a case involving the death of his fellow inmate, Seth Floyd. **Id.** at 621. Burton's co-defendant, Melvin Goodwine, was convicted of conspiracy. **Id.** In 2009, Goodwine filed an expungement motion in which he admitted to killing Floyd in self-defense, and further stated that he was advised not to raise that defense during his 1993 joint trial with Burton. **Id.** at 622. Burton did not discover Goodwine's expungement motion until 2013, when his case was being reviewed by a staff attorney with the Pennsylvania Innocence Project. **Id.** Citing **Bennett**, Burton filed a PCRA petition alleging that his 2013 discovery of Goodwine's 2009 expungement motion met the requirements of Section 9545(b)(1)(ii). **Id.** The PCRA court denied his petition as untimely. On appeal, this Court held that the public record presumption was not absolute, holding instead that "the presumption of access to information available in the public domain does not apply where the untimely PCRA

- 13 -

petitioner is *pro se*" and incarcerated. ***Commonwealth v. Burton***, 121 A.3d 1063, 1073 (Pa. Super. 2015) (*en banc*).

Our Supreme Court affirmed, finding that "the application of the public record presumption to *pro se* prisoners is contrary to the plain language of subsection 9545(b)(1)(ii) and was imposed without any apparent consideration of a *pro se* prisoner's actual access to information of public record." ***Burton***, 158 A.3d at 638. The ***Burton*** Court further advised that,

> in determining whether a petitioner qualifies for the exception to the PCRA's time requirements pursuant to subsection 9545(b)(1)(ii), the PCRA court must first determine whether "the facts upon which the claim is predicated were unknown to the petitioner." In some cases, this may require a hearing. After the PCRA court makes a determination as to the petitioner's knowledge, it should then proceed to consider whether, if the facts were unknown to the petitioner, the facts could have been ascertained by the exercise of due diligence, including an assessment of the petitioner's access to public records.

***Id.*** (footnote omitted).

Thus, ***Burton*** effectively created an exception to the public record presumption, an exception the PCRA court refused to apply in this case because Appellant had been represented by counsel since his 1989 conviction.[4] PCO at 8. However, the ***Burton*** exception to the public record presumption was short-lived, as our Supreme Court ultimately abandoned the public record presumption entirely in ***Small***.

---

[4] It is evident that Appellant was represented by counsel during the litigation of his prior PCRA petitions, although it is not clear if he has been continuously represented at all times since his conviction.

Small and his co-defendant, Larry Bell, were convicted in 1983 of second-degree murder and related offenses that occurred during the armed robbery of a marijuana dealer in 1981. *Small*, 238 A.3d at 1271–72. In 2014, Small filed a facially untimely PCRA petition, his fourth, alleging his discovery of Bell's testimony at a 1993 PCRA hearing that differed from his testimony at trial. *Id.* at 1272-74. It was undisputed "that the 1993 transcripts were public records." *Id.* at 1274. However, Small first discovered the existence of the transcripts in 2013 in a Superior Court opinion from 1998, and he filed a PCRA petition thirteen months later. *Id.* Small subsequently exercised "exceptional diligence" in his attempts to obtain the 1993 transcript until, finally, with the assistance of counsel, he obtained a copy in September of 2017. *Id.* Small then filed an amended petition within 60 days. *Id.*[5] The PCRA court determined that Small met the requirements of Section 9545(b)(1)(ii), thereby excusing the facial untimeliness of his petition, and further determined that he was entitled to a new trial on the merits of his after-discovered evidence claim. *Small*, 238 A.3d at 1275.

This Court reversed following the Commonwealth's appeal, holding, *inter alia*, "that Bell's 1993 transcripts were a matter of public record, and therefore could not be considered 'unknown' to Small[,]" and that the *Burton*

---

[5] Prior to December 24, 2018, Section 9545(b)(2) provided only a 60-day window to file a petition invoking a timeliness exception after the new claim could have been presented. *See Commonwealth v. Tedford*, 228 A.3d 891, 902 n.7 (Pa. 2020). Here, because Appellant filed his petition on August 23, 2018, he was subject to the 60-day time limit.

exception to the public record presumption did not apply because Small had been represented by counsel from 2008 to 2013. *Id.* at 1275-76 (citations to the Superior Court's memorandum decision omitted). Our Supreme Court ultimately affirmed the Superior Court's order on alterative grounds, holding that Small had failed to satisfy the terms of Section 9545(b)(1)(ii) because he had "known the substance of Bell's version of the events since their joint trial in 1983, and neither Bell's later summary nor his omission of minor details constitute[d] a 'new story' of the events." *Id.* at 1287. However, the *Small* Court rejected the lower court's application of the public record presumption, holding that

> because the public record presumption stands in tension with the plain language of the newly discovered fact exception, because we have recognized its deficiencies already in *Burton*, and because the instant appeal presents a direct challenge to its continued application, it is our prerogative and our duty to steer our precedent back toward the language of the statute from which we have strayed. Accordingly, we disavow the public record presumption. To the extent that earlier decisions, including our own, relied upon and applied that presumption to reject a petitioner's claim, they now are overruled.

*Id.* at 1285–86 (footnotes omitted).

Instantly, the PCRA court clearly applied the public record presumption in deeming Appellant's petition untimely without exception. *See* PCO at 8 (determining that the JSGC Report could not "be considered a newly-discovered fact for purposes of overcoming the time bar" because "the underlying data was known and available to the public for years prior to the report's release," and because "the *pro se* defendant exception[,]" *i.e.*, the

**Burton** exception to the public record presumption, did not apply due to Appellant's prior representation by counsel). Since the PCRA court ruled on that basis, and without the benefit of an evidentiary hearing, it failed to evaluate Appellant's factual averments regarding the two elements necessary to prove an exception under Section 9545(b)(1)(ii), those averments being that "the JSGC Report's conclusions and recommendations, and much of its underlying data, were unknown" to Appellant before the report's publication, Appellant's PCRA Petition, 8/23/18, at 6 ¶ 17, and that he "could not have previously discovered the factual predicates for his claims by exercising due diligence[,]" *id.* at 7 ¶ 18. Hence, Appellant argues in his first issue that this Court should remand for the PCRA court to assess these factual averments.

However, the PCRA court provided an alternative legal analysis for determining that Appellant failed to prove the applicability of the newly-discovered evidence exception, based on its reading of the JSGC report juxtaposed against our Supreme Court's decision in **Commonwealth v. Chmiel**, 173 A.3d 617 (Pa. 2017).[6] PCO at 8-9. Thus, we now turn to consider the PCRA court's alternative analysis, which first requires some discussion of our Supreme Court's ruling in **Chmiel**.

---

[6] Appellant repeatedly cited **Chmiel** in his petition. Particularly relevant here, Appellant cited **Chmiel** for the proposition that "a governmental agency's public admission of widespread, systemic error in criminal prosecutions, like the JSGC Report…, itself represents a new fact triggering the 60-day time period to file a successive PCRA claim." Appellant's PCRA Petition, 8/23/18, at 6-7 ¶ 17.

- 17 -

In **Chmiel**, the appellant filed an untimely PCRA petition, "asserting that his conviction and death sentence rested upon unreliable hair comparison evidence in violation of the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution…." **Chmiel**, 173 A.3d at 621. Chmiel argued that an FBI press release (and a related Washington Post article) regarding historically flawed hair analysis constituted new facts that satisfied the timeliness exception of Section 9545(b)(1)(ii). The press release was

> entitled "FBI Testimony on Microscopic Hair Analysis Contained Errors in at Least 90 Percent of Cases in Ongoing Review." In the press release, the FBI publicly disclosed the initial findings of an ongoing investigation undertaken jointly by the Department of Justice…, the FBI, the Innocence Project, and the National Association of Criminal Defense Lawyers…. The investigation scrutinized the testimony of FBI analysts concerning microscopic hair comparison analysis prior to 2000, the point at which mitochondrial DNA testing became routine in the FBI. The review was prompted by exonerations of three men who had been convicted, in part, based upon the scientifically flawed testimony of three FBI hair examiners. The review encompassed cases in which FBI microscopic hair comparison was used to link a defendant to a crime in both the federal and state systems. The FBI concluded that its examiners' testimony in at least 90% of cases contained erroneous statements. The FBI's findings "confirm[ed] that the FBI microscopic hair analysts committed widespread, systematic error, grossly exaggerating the significance of their data under oath with the consequence of unfairly bolstering the prosecution's case…."

**Id.** (citations omitted).

Importantly, the "revelation was the first time the FBI acknowledged that its microscopic hair analysts committed widespread, systemic error by grossly exaggerating the significance of their data in criminal trials." **Id.** at 625. In denying Chmiel's petition, the PCRA court had "narrowly construed

the newly[-]discovered[-]facts exception in holding that the underlying information contained in the FBI press release was simply confirmation of information that was already available in the public domain," relying on our Supreme Court's decision in **Commonwealth v. Edmiston**, 65 A.3d 339 (Pa. 2013), *overruled by* **Small**. **Id.** at 625-26. The **Chmiel** Court summarized its prior holding in **Edmiston** as follows:

> **Edmiston** involved a PCRA petition filed by a capital defendant who, like **Chmiel**, was convicted following the introduction of hair comparison analysis testimony at trial. On February 18, 2009, the National Academy of Sciences published a report entitled "Strengthening Forensic Science in the United States: A Path Forward" (hereinafter, "the NAS Report"). The NAS Report was a review of prior studies and articles, as well as the National Academy of Sciences' conclusion that "there was no scientific support for the use of microscopic hair analysis for individualization that is not accompanied by mitochondrial DNA analysis." **Edmiston**, 65 A.3d at 351.
>
> On April 17, 2009, Edmiston raised a facially untimely claim for post-conviction relief premised upon the NAS Report. **Edmiston**, 65 A.3d at 344. Edmiston relied upon the NAS Report in attempting to establish the newly[-]discovered[-]fact exception to the one-year time bar. **Edmiston**, 65 A.3d at 350–51; 42 Pa.C.S. § 9545(b)(1)(ii). Edmiston asserted that the NAS Report was a newly[-]discovered fact that supported his claim of actual innocence, because it demonstrated that the Commonwealth's hair analysis evidence was "false, misleading, and unreliable." **Edmiston**, 65 A.3d at 351.
>
> On appeal from the PCRA court's dismissal of Edmiston's petition as untimely, this Court addressed the applicability of the newly[-]discovered[-]facts exception to the PCRA's jurisdictional time restrictions. **See** 42 Pa.C.S. § 9545(b)(1)(ii). We observed that, "to constitute facts which were unknown to a petitioner and could not have been ascertained by the exercise of due diligence, the information must not be of public record and must not be facts that were previously known but are now presented through a newly discovered source." **Edmiston**, 65 A.3d at 352.[6]

- 19 -

Evaluating Edmiston's reliance upon the NAS Report as a newly discovered fact, this Court explained that "the 'fact' [that Edmiston] relies upon as newly discovered is not the publication of the NAS Report, but the analysis of the scientific principles supporting hair comparison analysis." *Id.* This Court held that the "fact" contained within the NAS Report was not new, as questions about the reliability of hair comparison analysis had existed in various sources prior to publication of the NAS Report: "Specifically, the NAS Report refers to various studies and reports published in the public domain as early as 1974 and as recently as 2007. As such, the information relied upon by [Edmiston] in the Report constitutes facts that were in the public domain and could have been discovered by [Edmiston] through the exercise of due diligence prior to the filing of his … Petition." *Edmiston*, 65 A.3d at 352. This analysis led the Court to conclude that the NAS Report failed to satisfy the timeliness exception for newly discovered facts.

> [6] We recently held that "the presumption that information which is of public record cannot be deemed 'unknown' for purposes of subsection 9545(b)(1)(ii) does not apply to *pro se* prisoner petitioners." … *Burton*, … 158 A.3d [at] 637-38….

*Chmiel*, 173 A.3d at 623–24.

The *Chmiel* Court ultimately rejected the PCRA court's reliance on

*Edmiston*, distinguishing Chmiel's claim as follows:

> There are **two newly discovered facts** upon which Chmiel's underlying claim is predicated, both of which were made public for the first time in the Washington Post article and the FBI press release. First, **the FBI publicly admitted that the testimony and statements provided by its analysts about microscopic hair comparison analysis were erroneous in the vast majority of cases**. The FBI's revelation reverberated throughout the country, marking a "watershed in one of the country's largest forensic scandals," precisely because it constituted a public admission by the government agency that had propounded the widespread use of such scientifically flawed testimony. The revelation was the first time the FBI acknowledged that its microscopic hair analysts committed widespread, systemic error by grossly exaggerating the significance of

their data in criminal trials. The Washington Post article acknowledged the novelty of the FBI's disclosures: "While unnamed federal officials previously acknowledged widespread problems, the FBI until now has withheld comment because findings might not be representative." Second, the FBI press release included the revelation that ***the FBI had trained many state and local analysts to provide the same scientifically flawed opinions in state criminal trials.***

With these newly discovered, material facts, the FBI press release indicates that Surma's[7] trial testimony may have exceeded the limits of science and overstated to the jury the significance of the microscopic hair analysis. Surma used microscopic hair analysis in an attempt to link Chmiel to the crime. The FBI now has publicly repudiated the use of microscopic hair analysis to "link a criminal defendant to a crime." The FBI's repudiation and disclosure about its role in training state and local forensic examiners satisfies Section 9545(b)(1)(ii), and entitles Chmiel to a merits determination of his underlying claim.

*Chmiel*, 173 A.3d at 625–26 (emphasis added; citations to the record omitted).

Here, in its alternative analysis, the PCRA court found that

the JSGC [R]eport is substantially different than the press release in *Chmiel*. The press release in *Chmiel* contained an admission of improper scientific analysis from the prosecutorial agency that had been convicting defendants using this analysis. The JSGC [R]eport, on the other hand, was released by an independent and bipartisan governmental agency and does not include any language that could be considered an admission of error by prosecutors or the judiciary with respect to the imposition of the death penalty. [Appellant] claims that the report contains "the admission of widespread, systemic error in criminal prosecutions," however, this [c]ourt's review of the text of the report did not uncover such an admission. While the report does note areas of concern and suggests recommendations, it does not go so far as

_____

[7] Surma testified at Chmiel's trial as the Commonwealth's hair analysis expert.

to admit widespread, systemic error in criminal prosecutions. It should also be noted that the task force members behind the report are Pennsylvania state senators, unlike the press release in *Chmiel* which was released by the FBI, a federal law enforcement agency. Since the holding in *Chmiel* is inapplicable, this [c]ourt properly dismissed [Appellant]'s petition as untimely since the JSGC [R]eport was not a newly-discovered fact capable of overcoming the PCRA's time bar.

PCO at 8-9.

Thus, rather than relying on the *Burton* exception to the public record presumption in determining that Appellant failed to satisfy the requirements of Section 9545(b)(1)(ii), the PCRA court's alternative analysis instead focused on deficiencies regarding the nature and the source of the ostensible new evidence. The court indicated that, unlike the FBI's admission in *Chmiel*, which had a direct link to expert evidence admitted in Chmiel's trial to prove his guilt, the JSGC Report contains no analogous admissions of misconduct or faulty science regarding the selection of Appellant's jury by either the investigating agency involved in Appellant's case or by the District Attorney's Office that prosecuted him. Thus, the PCRA court was unconvinced by Appellant's reliance on *Chmiel* as to whether he satisfied the requirements of Section 9545(b)(1)(ii).

The Commonwealth agrees with the PCRA court that there is no "analogous link" between the content of the JSGC Report in this case and the FBI's admissions in *Chmiel*. Commonwealth's Post-Remand Brief at 19 (stating that Chmiel's petition asserted that "the forensic examiner who testified in [Chmiel's] case was trained by the FBI and provided that same

scientifically unsupportable testimony[,]" which "demonstrated a link between the newly discovered fact and [Chmiel's] conviction, requiring a remand for further factfinding"). By contrast, nothing in the JSGC Report speaks directly to the manner or circumstances in which Appellant's jury was selected beyond generalities about the *potential* of death-qualified juries being biased against capital defendants.

The Commonwealth concedes that, "in certain places, the [JSGC] Report does, in fact, contain new facts" that might satisfy the requirements of Section 9545(b)(1)(ii), but that Appellant has failed to cite those facts or tie them to a claim he could potentially raise if he overcomes the PCRA's time bar. *Id.* at 5. The Commonwealth acknowledges that

> no litigant could reasonably be expected to independently acquire statistical data from the Department of Corrections regarding the number of capitally sentenced individuals with IQs of 75 or lower. JSGC Report[] at 7-8, 120-[]21. Nor would such a litigant have access [to] statistics regarding the number of capitally sentenced individuals receiving mental health services. [*Id.*] at 9-10, 124-[]25.

> Particularly after **Small**, **supra**, the Commonwealth also agrees that statistics regarding the number of death sentences imposed on defendants represented by court-appointed counsel were not available before the [JSGC] Report. JSGC Report[] at 17, 75, 89. Similarly, prior to the [JSGC] Report, statistics regarding the percentage of death sentences overturned statewide due to ineffective assistance of counsel could not realistically have been developed independently by individual litigants. [*Id.*] at 183-[]84. The Commonwealth agrees that statistical data such as this, which took the preparers of the [JSGC] Report some six years to gather and evaluate, constitute new evidence that a PCRA petitioner could not have discovered sooner through the exercise of due diligence. **Small**, 238 A.3d at 1286.

Commonwealth's Post-Remand Brief at 7-8.

However, the Commonwealth notes that the JSGC Report separately

refers to conclusions drawn by other outside researchers and entities—conclusions not based on any statistical data independently developed or verified by the actual preparers of the [JSGC] Report. Often these conclusions appear in quotation marks. Although it states that an outside researcher reached these conclusions, the [JSGC] Report does not explicitly vouch for those conclusions as its own.

Such instances specifically include the passages cited in [Appellant]'s brief. *See*[,] *e.g.*[,] JSGC Report[] at 11, 146[,] cited in [Appellant's Post-Remand Brief] at 10. There, in a context distinct from any discussion of intentional discrimination by prosecutors in the selection of capital juries, the [JSGC] Report separately discusses the "death qualification" process. In addressing the possible impact of that process on the composition of capital juries, the [JSGC] Report quotes an article written by Logan A. Yelderman, *et. al.*, which appeared in a book entitled Advances in Psychology and Law. JSGC Report[] at 11 n.73. According to the Yelderman article:

> Research examining the effects of death qualification on jury composition *suggests* that death qualification often results in juries that are biased in ways that consistently disadvantage capital defendants.

[*Id.*] at 11, 146 (emphasis added).[3] Importantly, although it notes certain conclusions drawn by the Yelderman article, the [JSGC] Report does not explain or examine the "research" underlying those conclusions. Nor does the [JSGC] Report explicitly endorse the validity of Professor Yelderman's conclusions, which "suggest" that death qualification can inadvertently operate to exclude members of certain groups, where disapproval of the death penalty is more pervasive. Significantly, the [JSGC] Report does not explain how Yelderman reached his conclusions and does not discuss any statistical studies that support his conclusions. [*Id.*] at 146.

[3] Although the [JSGC] Report does not explain who the author is, an internet search discloses that Yelderman is "an assistant professor of psychology in the Prairie View A&M University College of Juvenile Justice and Psychology. He

has a Ph.D. in Social Psychology from the University of Nevada, Reno. His research lies at the intersection of religion, social psychology, and law. His primary interests involve topics associated with religious fundamentalist beliefs, insanity defense and death penalty decision-making, emotion, and parole. Additional research interests involve problem-solving courts, particularly juvenile drug treatment courts." http://www.pvamu.edu › cojjp.

Similarly, the Report quotes that portion of the Yelderman article that states that "the death qualification process *potentially* results in biased juries." [*Id.*] at 145 (emphasis added). The Report quotes the same article to the effect that "[t]he process *likely* excludes those who strongly oppose the death penalty at a higher rate than those who strongly support the death penalty." [*Id.*] at 146 (emphasis added). Once again, the Report does not evaluate or explain the basis for Yelderman's conclusions regarding the "potential" or "likely" impact of the death qualification process. The [JSGC] Report notes, however, that in **Wainwright v. Witt**, 469 U.S. 412 (1985), the United States Supreme Court upheld the process whereby participation in capital juries is limited to venirepersons who are willing to consider imposing the death penalty.

Notably, although [Appellant] claims that the Commonwealth purposely employed discriminatory jury selection practices here, his brief does not cite any section of the Report that specifically addresses that issue.

Commonwealth's Post-Remand Brief at 8-11.

The Commonwealth consequently maintains that Appellant cannot benefit from the holding in **Small**, "because those sections of the JSGC Report cited in both [Appellant's] PCRA petition and his Brief do not contain the type of new facts that can be found elsewhere in the Report--*i.e.*[,] factual determinations based on statistics compiled and evaluated by the preparers of the [JSGC] Report themselves." **Id.** at 15. The Commonwealth argues that "the portions relied upon by" Appellant are instead "conclusions drawn by

outside researcher Logan A. Yelderman regarding the impact of the death qualification process on the composition of capital juries." *Id.* at 16. The Commonwealth notes that Yelderman "was not a member of the Advisory Committee that prepared the [JSGC] Report[,]" the JSGC Report never "explain[ed] the basis for Yelderman's conclusions[,]" and that "the preparers of the Report themselves [did not] independently verif[y] Yelderman's conclusions, either on the basis of Yelderman's research or on the basis of their own evaluation of statistical data from Pennsylvania." *Id.* The Commonwealth observes that "the quotations from the Yelderman article seemingly address possibilities and likelihoods, rather than statistically verifiable facts." *Id.*

The Commonwealth contrasts these references to Yelderman's conclusions with portions of the JSGC Report that constitute statements "of fact based on statistical data compiled by the preparers" of the JSGC Report. *Id.* at 17. Furthermore, the Commonwealth argues that, "even if the [JSGC] Report contained a new fact about the death qualification process, that new fact would not support [Appellant]'s claim of purposeful prosecutorial discrimination against African American venirepersons during his own trial" because Appellant's "brief does not cite to any facts in the Report that specifically address issues relating to *Batson v. Kentucky*, 476 U.S. 79 (1986)." *Id.* at 18. The Commonwealth concludes that since Appellant's "new fact[s are] not based on statistics compiled and evaluated by the preparers of the JSGC Report and" where such facts would "not support [his] claim of

purposeful discrimination, this Court should affirm the PCRA court's decision."

*Id.* at 20.

Appellant responds that the Commonwealth misconstrues the nature of the "new facts" he cites from the JSGC Report. He maintains that, "[c]onsistent with his PCRA [P]etition, in both his pre- and post-remand briefing to this Court, [Appellant] argued that the JSGC's admissions and recommendation related to race discrimination in jury selection are the new facts on which he bases his PCRA petition." Appellant's Post-Remand Reply Brief at 4. Specifically, Appellant first argues that:

> The PCRA Petition relies on the JSGC's admission, following an internal investigation, that juries selected in Pennsylvania capital cases like [Appellant]'s were shaped by a discriminatory jury selection process that eliminated certain demographic groups. *See* PCRA Petition [at] ¶¶ 11, 15, 17, 33. The JSGC based this conclusion, in part, on a survey of existing social science literature. However, contrary to the Commonwealth's assertion, [Appellant] does not contend that the discussion of the social science literature itself is a "new fact" but rather that it is the JSGC's admission that gives rise to the PCRA court's jurisdiction.

Appellant's Post-Remand Reply Brief at 2-3.

Second, Appellant relies on "the *recommendation* endorsed by the JSGC to remedy the systemic errors in capital jury selection…." Appellant's Post-Remand Reply Brief at 3 (emphasis in original). He avers that

> [t]he JSGC [Report] recommended the "enactment of a Racial Justice Act to statutorily allow death sentences to be challenged on a statistical basis," *i.e.*, without necessarily establishing purposeful, conscious discrimination. *See*, *e.g.*, PCRA Petition [at] ¶ 11. It would have been nonsensical for the JSGC to make such a recommendation without first recognizing that the problem

of racial discrimination infected capital prosecutions in the Commonwealth.

Appellant's Post-Remand Reply Brief at 3-4.

In contrast with the petitioner's successful invocation of Section 9545(b)(1)(ii) based upon the FBI's admissions in *Chmiel*, we agree with the Commonwealth that, here, the alleged admissions in the JSGC Report does not constitute new facts upon which Appellant might eventually obtain relief. Appellant has failed to cite evidence from the JSGC Report of the sort of widespread, systemic error akin to the new facts addressed in *Chmiel*. In *Chmiel*, the FBI admitted that its hair analysis was flawed in the vast majority of cases, and that its own experts, and the experts trained by the FBI, had given fatally flawed scientific opinion testimony concerning the strength of that evidence in virtually every case in which hair analysis was presented.[8] That provided a distinct and concrete link to the flawed evidence and related scientific opinion testimony presented at Chmiel's trial, where the Commonwealth had called a witness, Surma, who had made the problematic scientific claims on behalf of the prosecution. Thus, on their face, the new facts in *Chmiel* held the potential to afford Chmiel a new trial based on after-discovered evidence that directly refuted some of the evidence that had been used to convict him.

---

[8] "[T]he FBI publicly admitted that the testimony and statements provided by its analysts about microscopic hair comparison analysis were erroneous in *the vast majority of cases*." *Chmiel*, 173 A.3d at 625 (emphasis added).

There is no analogous admission in the instant case regarding the prosecutor's ostensible, discriminatory exclusion of jurors at Appellant's capital trial based on race, nor for any other issue regarding juror bias due to the death qualification process. There has been no revelation in the JSGC Report of a specific error in Appellant's case, an admission of such an error by the prosecutor or the District Attorney's office, nor an admission of a systemic error that **necessarily** impacted or was **likely** to have affected Appellant's conviction. To the contrary, we agree with the Commonwealth's assessment that the alleged admission in the JSGC Report is merely a quotation of a conclusion from an outside scholar, Yelderman, who, based on research and statistics neither discussed nor revealed in the report, surmised that "that the death qualification process **potentially** results in biased juries." JSGC Report at 10-11 (quoting Logan A. Yelderman *et al.*, *Capital-izing Jurors: How Death Qualification Relates to Jury Composition, Jurors' Perceptions, & Trial Outcomes, in Advances in Psychology & Law*: Vol. 2, 27, 32 (B.H. Bornstein & M.K. Miller eds. 2016) (emphasis added).[9] Even if the JSGC Report can be said to have endorsed these statements from the Yelderman Article, the statements only speak to a potential of biased or unfairly excluded jurors due to the death qualification process. It did not state or imply that potential jurors from Appellant's trial had been unfairly excluded by race, intentionally or unintentionally, nor did it state that any of the jurors had actually been

---

[9] Hereinafter "Yelderman Article."

biased in favor of finding him guilty. The JSGC Report also did not state that there was a significant probability that either of these types of errors occurred. Rather, the portions of the Yelderman Article discussed in the JSGC Report that were cited by Appellant as newly-discovered facts in his PCRA petition speak only of hypothesized potential of such errors due to the manner in which jurors are qualified to try a capital case. Indeed, the manner in which the JSGC Report discusses Yelderman's research strongly suggests that further inquiries are required to demonstrate the magnitude of the death qualification process's potential to affect juror demographics and biases.[10, 11]

_____

[10] In describing Yelderman's research, the JSGC Report indicates that that his research "***suggests*** that 'the death qualification process facilitates convictions[,]'" and that the "***contention*** is that systematically excluding" jurors based their unwillingness to issue a death sentence "leads to 'increased receptivity to guilt confirming evidence and aggravating factors while simultaneously rejecting innocence confirming evidence and mitigating factors.'" JSGC Report at 147 (quoting Yelderman Article at 47, 42) (emphasis added). This language indicates that the JSGC Report is describing troubling-yet-reasonable ***hypotheses*** that jurors are systemically selected for a pro-conviction bias and/or disproportionated excluded by race via the death qualification process, rather than a statement of fact about empirical research demonstrating a final or definitive conclusion that jurors are, in fact, biased or excluded on racial grounds by that process. Indeed, the JSGC Report then admits that "[t]his research has not yet been judicially accepted[,]" citing Yelderman's own recommendations for further inquiry, such as using "actual trials, trial videos, or reenactments … to increase the realism related to participating in a capital trial[,]" suggesting that no such empirical research to prove or verify Yelderman's hypotheses has yet occurred. JSGC Report at 147 (quoting Yelderman Article at 48).

[11] Appellant appears to suggest that his failure to prove a link between the JSGC Report and a specific and/or likely error in his own case constitutes analysis on the merits of his underlying claim. ***See*** Appellant's Post-Remand
*(Footnote Continued Next Page)*

Brief at 6 (arguing that the Commonwealth's assertion that he failed to demonstrate a sufficiently close link between the newly-discovered facts and his conviction "conflates the jurisdictional inquiry under [Section] 9545(b)(1)(ii) with the separate merits inquiry into whether a new fact is sufficiently related to a petitioner's claims"). We disagree. We assume for purposes of our analysis under the newly-discovered-facts exception that the portions of the JSGC Report cited by Appellant are credible, and that that they are fairly construed as admissions by the state. Nevertheless, we conclude that the nature of the admission—that *potential* risks exist of demographic groups being excluded from juries and/or jurors being selected for a pro-conviction bias due to death qualification—cannot alone demonstrate that Appellant's jurors were compromised in that manner. Stated another way, even if Appellant could prove, on the merits of his underlying claims, that such a potential existed when his jury was empaneled, that would fall far short of proving any significant likelihood that the specific jurors in Appellant's case were compromised by the death qualification process.

As this Court explained while discussing ***Chmiel*** in ***Commonwealth v. Robinson***, 185 A.3d 1055, 1062 (Pa. Super. 2018): "[A] recognition of 'the underlying claim' was relevant to Chmiel's invocation of [Section] 9545(b)(1)(ii)…, even if that analysis did not assess the strength of those newly-discovered facts as it bore on the likelihood of ultimately achieving relief." The ***Robinson*** Court noted that Section 9545(b)(1)(ii) provides a "gatekeeping function" that requires at least some minimal assessment of how a newly-discovered fact might ultimately affect a claim upon which relief might ultimately be granted. ***See id.*** at 1061-62. Here, in rejecting Appellant's invocation of Section 9545(b)(1)(ii), we do not reject the credibility or weight of Appellant's ostensibly newly-discovered facts. We accept for purposes of our analysis under the newly-discovered-fact exception that the JSGC Report constitutes a government admission that the death qualification process has the ***potential*** to exclude racial or other demographic groups disproportionately, and/or to select for a pro-conviction bias. However, we conclude that, even viewing these factual averments in a light most favorable to him, those new facts would still not be of a nature or quality that could ultimately provide him with relief on his underlying claim(s), because they speak only to a potential of systemic error in all death penalty trials, rather than a quantifiable likelihood that such a systemic error necessarily or probably impacted Appellant's case specifically.

Thus, Appellant fails to convince us that the 'admissions' cited from the JSGC Report are of a nature or quality on par with, or even approaching, the revelations that satisfied the timeliness exception of Section 9545(b)(1)(ii) in ***Chmiel***. The FBI's admission in ***Chmiel*** was that the hair analysis actually used to demonstrate Chmiel's guilt was fundamentally flawed, directly undermining confidence in the fairness of his conviction. Here, by contrast, the 'admissions' cited by Appellant from the JSGC Report speak only to a supposition that the death qualification process potentially biased jurors in favor of guilt and/or excluded certain racial groups from the pool of eligible jurors. In our view, such 'admissions' do not add any new facts of a higher grade or quality regarding Appellant's previously-litigated ***Batson*** claims, or for any other claim premised on juror bias, because the new facts only speak to a generalized potential that the death qualification process undermined the fairness of the composition of Appellant's jury.

We also conclude that the recommendations contained in the JSGC Report cannot satisfy the requirements of Section 9545(b)(1)(ii). The JSGC Report recommended as follows: "One remedy supported by the subcommittee on procedure would be enactment of a Racial Justice Act to statutorily allow death sentences to be challenged on a statistical basis, in addition to purposeful discrimination." JSGC Report at 149.

First, this recommendation does not satisfy the newly-discovered-fact exception because it speaks exclusively to a potential legislative remedy for death row inmates. As noted above, Appellant's sentence has already been

commuted to life imprisonment and, therefore, he does not fall within the scope of the proposed remedy. By its express terms, the subcommittee's recommendation does not address persons in Appellant's situation, those being individuals who were tried by a death-qualified jury, but who were not sentenced to death or who are no longer subject to the prospect of capital punishment.

Second, the recommendation is for a potential legislative remedy, one that has not yet come into being. A proposed legislative remedy is a policy aspiration, not a newly-discovered fact that is pertinent to an existing set of legal claims. This recommendation adds nothing to Appellant's ability to seek relief under the current legal framework of his underlying claims, under **Batson** or otherwise. To the contrary, the proposed relief is a tacit acknowledgment that a legal remedy for statistical-based claims challenging the death qualification process's effect on jury composition and bias does not yet exist.

Appellant argues that it "would have been nonsensical for the JSGC to make such a recommendation without first recognizing that the problem of racial discrimination infected capital prosecutions in the Commonwealth." Appellant's Post-Remand Reply Brief at 3-4. While this may be true, recognition of a **potential** systemic problem is not the same thing as an admission of error, or even an admission of a likely error, in the empaneling of every death-qualified jury. Rather, it is a proposal for how such issues might be further examined and addressed in the future. Appellant's argument

that such a remedy must exist now under the PCRA due to the JSGC's recommendation is mere bootstrapping. Accordingly, we conclude that the JSGC's recommendation also does not satisfy the requirements of Section 9545(b)(1)(ii). Thus, Appellant's second claim lacks merit.

Because we conclude that Appellant cannot possibly satisfy Section 9545(b)(1)(ii) based on the admissions and recommendations he cited from the JSGC Report, we ascertain no need to remand for an evidentiary hearing. Furthermore, due to Appellant's failure to successfully invoke an exception to the PCRA's timeliness requirements, we do not reach his third and fourth claims addressing the merits of his underlying claim(s).[12]

Order *affirmed*.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 11/09/2022

---

[12] Consequently, we do not address the PCRA court's alterative analysis on the merits of Appellant's underlying *Batson* claim.