J-S43004-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| MALIK SAMUELS | : | |
| | : | |
| Appellant | : | No. 2461 EDA 2023 |

Appeal from the PCRA Order Entered August 25, 2023
in the Court of Common Pleas of Philadelphia County Criminal Division
at No(s): CP-51-CR-1301575-2006

BEFORE: BOWES, J., STABILE, J., and KUNSELMAN, J.

MEMORANDUM BY BOWES, J.: **FILED FEBRUARY 12, 2025**

Malik Samuels appeals from the order that denied without a hearing his serial petition filed pursuant to the Post Conviction Relief Act ("PCRA"). We affirm.

This Court summarized the history of this case as follows:

At 10:50 p.m. on November 30, 2005, Appellant shot and killed Abdul Colon ["Victim"] with a revolver in front of the Tender Line Bar in Philadelphia, Pennsylvania. Three Temple University students witnessed the shooting: Lindsey Bennett, Jessica Lique, and Beth Holland. Both Bennett and Lique testified that they had known Appellant and Victim for a number of years. Additionally, Bennett and Holland testified that Appellant was wearing a distinctive yellow sweat suit when he shot Victim.

Moments before the shooting, Lique and Holland entered the bar, passing Victim at the door, while Bennett remained outside to talk on her cell phone. As Lique and Holland passed Victim, Appellant asked Holland to move out of his way. Appellant then pulled out his gun and fired once at Victim from ten feet away. The shot struck Victim in his left shoulder. Victim attempted to flee into the bar, but Appellant followed him inside and fired three more

shots toward him. One of the shots struck Victim in his lower back. Thereafter, Appellant left the bar and drove away. Victim was dead [when first responders arrived] at 11:00 p.m., with two gunshot wounds, one to his shoulder and one to his lower back.

Appellant fled to South Carolina for six months, but returned to Philadelphia sometime in early May 2006. On June 9, 2006, police arrested Appellant on the 2900 block of Memphis Street in Philadelphia.

Following trial [at which Appellant testified to support a defense of self-defense], the jury found Appellant guilty of first-degree murder and possessing an instrument of crime. On January 23, 2008, the trial court sentenced Appellant to life imprisonment for first-degree murder and a concurrent term of fourteen to forty-eight months of imprisonment for possessing an instrument of a crime. [Appellant filed a timely *nunc pro tunc* appeal after a timely post-sentence motion was denied and his appeal rights were reinstated through a PCRA petition.]

On July 25, 2012, this Court affirmed Appellant's judgment of sentence, and our Supreme Court denied his petition for allowance of appeal on January 10, 2013. Appellant did not seek a writ of certiorari in the United States Supreme Court.

Appellant filed timely a *pro se* PCRA petition on October 25, 2013, claiming he was entitled to relief based upon after-discovered evidence and ineffectiveness of trial counsel . . . for failing to object to the admission of Appellant's criminal convictions at trial, and for failing to object to an alleged violation of Appellant's right to a speedy trial. Specifically, he attached an affidavit dated September 11, 2013, of Lawrence Peel, a fellow inmate, which alleged that Peel removed a gun from Victim's hand after Appellant shot Victim. According to Appellant, this evidence would have aided his self-defense claim at trial.

***Commonwealth v. Samuels***, 224 A.3d 743, 2019 WL 5792781, at \*1–2

(Pa.Super. 2019) (non-precedential decision) (cleaned up).

Counsel was appointed and additional pleadings filed, attaching

documentation suggesting that two more witnesses could corroborate that

Victim had a gun and had "swung on" Appellant. *Id*. at *3. The PCRA court held a hearing at which Peel and others testified. The court ultimately dismissed the petition upon finding the witnesses incredible, and this Court affirmed. *Id*.

On July 26, 2021, in connection with federal *habeas corpus* proceedings, Appellant's retained counsel discovered in the file of the District Attorney's Office ("DAO") a previously-undisclosed FBI report sent by facsimile to the DAO on July 2, 2007. The FBI report contained a summary of crimes witnessed by "F.W.," an informant, including the following:

> [F.W.] said that a couple of weeks before he was arrested in December 2005 for the 7-11 robbery that he had seen [Victim] get shot outside the Tender[ L]ine Bar around 12th and Green Streets by a young guy he knew by the first name "MALIK"[1] who lived at 12th and Fairmont Streets. [F.W.] stated that he parked his taxi cab around the corner from the bar on Wallace Street and as he walked up he saw [Victim] and "MALIK" "having words" outside the bar and [F.W.] decided not to go in the bar because he knew that [Victim] had been involved in shootings before and he knew that MALIK was a "hothead." [F.W.] advised that a friend of his named "HOGUE" was at the bar and was telling both men to be cool. [F.W.] related that as he was walking away he saw MALIK take out a handgun, point it at [Victim] and sho[o]t multiple times at him. [F.W.] explained that he was close enough that he saw the spark coming from the gun and that as he heard the shots [Victim] ran back into the bar and MALIK ran after him into the bar continuing to fire. [F.W.] said that his friend "NOOK" was also in the bar and when [F.W.] called him a little later "NOOK" said that the "dude" is gone and [F.W.] knew that meant that [Victim] had been killed by the shooting. [F.W.] indicated that when "NOOK" tried to talk on the phone about the "young bull" [F.W.] cut him off and said I know. [F.W.] stated that he

_____

[1] As a reminder, Appellant's first name is Malik.

knew both [Victim] and MALIK and would be able to identify photographs of both men.

PCRA Petition, 2/23/22, at 11.

Appellant promptly filed a PCRA petition alleging that the Commonwealth's failure to disclose F.W.'s statement constituted a violation of **Brady v. Maryland**, 373 U.S. 83 (1963). The Commonwealth moved to dismiss the petition, asserting that, while the petition satisfied an exception to the PCRA's one-year time bar, it lacked merit.[2] Appellant filed a response arguing that the petition was meritorious because F.W.'s statement corroborated Appellant's testimony. The PCRA court, without issuing Pa.R.Crim.P. 907 notice or holding a hearing, denied Appellant's petition by order of August 25, 2023.

---

[2] In particular, Appellant in his patently-untimely petition invoked the exceptions codified at 42 Pa.C.S. § 9545(b)(1)(i) and (ii), which apply respectively when "the failure to raise the claim previously was the result of interference by government officials with the presentation of the claim in violation of the Constitution or laws of this Commonwealth or the Constitution or laws of the United States," and when "the facts upon which the claim is predicated were unknown to the petitioner and could not have been ascertained by the exercise of due diligence[.]" The Commonwealth conceded, and the PCRA court apparently agreed, that Appellant's petition satisfied this exception. Since the timeliness of a PCRA petition is jurisdictional and we are not bound by the parties' agreement on the issue, it is proper for this Court to *sua sponte* address the applicability of the alleged exception. **See Commonwealth v. Rivera**, 324 A.3d 452, 468 n.16 (Pa. 2024). Upon review, we agree that Appellant's petition satisfies the PCRA's timeliness strictures. **Accord Commonwealth v. Natividad**, 200 A.3d 11, 29 (Pa. 2019) (concluding that **Brady** claim raised promptly after the disclosure of the withheld material satisfied the § 9545(b)(1)(i) and (ii) exceptions).

This timely appeal followed. The court directed Appellant to file a Pa.R.A.P. 1925(b) statement, and he complied. The court thereafter authored a responsive Rule 1925(a) opinion. Appellant presents the following question for our resolution: "Did not the [PCRA] court err and abuse its discretion in denying relief, or alternatively in denying a hearing, where [Appellant] discovered and timely presented exculpatory evidence formerly suppressed by the Commonwealth . . . that would have materially advanced his trial defense of self-defense?" Appellant's brief at 4.

We begin with the applicable legal principles. "[W]e review an order dismissing or denying a PCRA petition as to whether the findings of the PCRA court are supported by the record and are free from legal error." *Commonwealth v. Howard*, 285 A.3d 652, 657 (Pa.Super. 2022) (cleaned up). Overall, "[i]t is an appellant's burden to persuade us that the PCRA court erred and that relief is due." *Commonwealth v. Stansbury*, 219 A.3d 157, 161 (Pa.Super. 2019) (cleaned up).

Our Supreme Court has offered a summary of the law governing *Brady* claims:

> In *Brady*, the United States Supreme Court held that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution. The Supreme Court subsequently held that the duty to disclose such evidence is applicable even if there has been no request by the accused, and that the duty may encompass impeachment evidence as well as directly exculpatory evidence. Furthermore, the prosecution's

- 5 -

*Brady* obligation extends to exculpatory evidence in the files of police agencies of the same government bringing the prosecution.

On the question of materiality, the Court has noted that such evidence is material if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. The materiality inquiry is not just a matter of determining whether, after discounting the inculpatory evidence in light of the undisclosed evidence, the remaining evidence is sufficient to support the jury's conclusions. Rather, the question is whether the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict. Thus, there are three necessary components that demonstrate a violation of the *Brady* strictures: the evidence was favorable to the accused, either because it is exculpatory or because it impeaches; the evidence was suppressed by the prosecution, either willfully or inadvertently; and prejudice ensued.

*Commonwealth v. Lambert*, 884 A.2d 848, 853-54 (Pa. 2005) (cleaned up).

The PCRA court explained its rejection of Appellant's *Brady* claim as follows:

In the reproduced FBI report, F.W. agrees with the students that the altercation between Appellant and [Victim] began on the sidewalk in front of the bar and then continued into the bar itself. F.W.'s account that Appellant shot [Victim] the first time after "having words," which the students did not say, does not transform the account into one supportive of Appellant's self-defense theory. F.W. does not report that he saw [Victim] "reaching" for a gun, as [Appellant] did, nor does he purport to know what words were spoken between the two men. Without more, mere verbal insults are generally insufficient to make out a self-defense theory. *See*, *e.g.*, *Commonwealth v. Mouzon*, 53 A.3d 738, 751 (Pa. 2012).

Also, F.W.'s account materially corroborates the testimony of both (a) the students and (b) the medical examiner, who told the court, respectively, that (a) [Appellant] followed the [Victim] into the bar shooting after him, and that (b) the shot that likely killed the [Victim] was [the one] to his back.

- 6 -

> Thus, F.W.'s account is neither favorable nor material to Appellant.

PCRA Court Opinion, 4/29/24, at 4 (cleaned up).

Appellant assails the PCRA court's conclusion as to the immateriality of F.W.'s statement by arguing that it "was at odds with the totality of the testimony of the three women" and that it "powerfully corroborated" his otherwise-uncorroborated testimony about Victim's violent nature. **_See_** Appellant's brief at 20-21.

By way of background, Appellant testified at trial that he had grown up with Victim, a violent man who dressed in fatigues and called himself a general, but he stopped associating with Victim when he tried to recruit Appellant to serve as one of his soldiers. On the day in question, Victim, who had made it clear that he viewed Appellant's rejection as a betrayal, approached Appellant in the bar, threw a punch, and told Appellant to meet him outside. Another bar patron advised Appellant that Victim was crazy and slipped a gun into Appellant's pocket as Appellant, intending to go to his car and leave, exited the bar. **_See_** N.T. Trial, 12/10/07, at 28-52. Appellant described what occurred outside as follows:

> He is, like, you think you tough, you going to be the cause of a lot of bodies dropping, you could die tonight.
>
> I turned around and started walking off, like, I got in the street. Now, whoever the guy was with him said, [Victim,] no.
>
> Once I turned around he was reaching. I just shot, not at him or anything, I just shot, like, thought I was shooting, like, high.

. . . .

> [H]e just turned around and I never thought I hit him. The way he just turned around and was going into the bar and ducking a little, I never thought he was hit. He opened the door regular and everything. I never thought I hit him. I was just trying to get enough time to get to my car and pull off. I was just trying to get away from him.

*Id*. at 51-52. Appellant denied that he had gone back towards the bar during the incident, stating that he "ran and hopped in the car" after he pulled the trigger, which he only recalled doing once. *Id*. at 52.

Appellant argues that F.W.'s statement confirms his testimony that Victim was outside the bar engaged in a heated discussion with Appellant before the shooting, while the three Temple students indicated that Victim was not outside the bar, but instead in the doorway at the time, and that he said nothing before he was shot. *See* Appellant's brief at 20. Appellant further asserts that F.W.'s indication that Victim had a history of gun violence would have shown the jury that Appellant's testimony about his fear of Victim was not merely self-serving. *Id*. at 21-22.

Upon review of the certified record, we discern that Appellant's representations are meritless. As for the testimony of the Temple students, they described the entrance to the bar as being on a diagonal pointing towards the northwest corner of 12th and Green Streets with two steps leading from the sidewalk to the door. *See* N.T. Trial, 12/5/07, at 71; N.T. Trial 12/6/07, at 57. Bennett placed Victim on the sidewalk in front of the bar when she arrived, talking on her mobile phone. *See* N.T. Trial, 12/5/07, at 70. Holland

indicated that Victim was in the doorway such that they had to squeeze by him to get into the bar. *See* N.T. Trial, 12/6/07, at 55-56. Lique testified that Victim was near the entrance to the bar, a few feet in front of the steps. *Id*. at 102, 104. As such, Appellant's contention that the students testified that Victim was not outside the bar is belied by the record.

Additionally, neither Appellant nor F.W. suggested that the verbal altercation between Victim and Appellant continued unabated until the moment of the shooting. Lique stated that she was barely through the door behind Holland before Appellant fired the first shot. *Id*. at 125. The fact that none of the women heard any conversation between Appellant and Victim in the seconds immediately prior to the shooting is not contradicted by F.W. or inconsistent with the testimony of Appellant.

Furthermore, our review of the trial transcripts reveals that Appellant's portrayal of Victim as a violent man was indeed corroborated by several stipulations. First, the jury heard that Victim had prior convictions for assault, drug delivery, and firearms violations. *See* N.T. Trial, 12/10/07, at 134-35. Second, the Commonwealth stipulated, at Appellant's request, that Victim had tattoos on his arms which read "death will come on swift wings to he who disturbs the general," "life is a thug," and, surrounded by chains "soldier." *Id*. at 135.

In sum, F.W.'s statement indicated that he saw "hothead" Appellant and Victim outside the bar, where Appellant pulled a gun and fired shots at Victim,

and Appellant continued to fire shots at Victim as Victim ran into the bar. The Commonwealth's evidence at Appellant's trial established that he initially shot Victim outside the bar, that he continued to shoot Victim in the back as Victim went inside the bar, and Victim died from a shot to the back. The jury heard Appellant's testimony about Victim's violent tendencies, which was corroborated by the stipulations concerning Victim's criminal history and tattoos. Under these circumstances, even considering F.W.'s favorable corroboration of Victim's prior involvement in shootings, the withheld evidence does not "put the whole case in such a different light as to undermine confidence in the verdict." *Lambert*, 884 A.2d at 853-54 (cleaned up). Therefore, the PCRA court did not err in denying Appellant's *Brady* claim for lack of materiality.

Order affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 2/12/2025