OPINION BY FITZGERALD, J.: The Commonwealth appeals from an order granting the motion of Appellee, John Kunco, for post-conviction DNA testing in this sexual assault case pursuant to 42 Pa.C.S. § 9543.1. The Commonwealth argues that the evidence in support of Appel-lee’s motion does not present a prima facie case of actual innocence. We affirm. The evidence presented during Appel-lee’s trial was as follows. On December 16, 1990, at approximately 5:00. a.m., Donna Seaman — who was blind in her right eye, farsighted in her left eye, and not wearing glasses — awoke to. find a man, whose face she could not see, standing in her bedroom. R.R. 431a, 459a-460a.[1] The assailant ripped Seaman’s nightgown' off, slapped her to induce her silence, and threatened that he had a knife. He took one of her girdles and placed it over her head as a blindfold. RiR. 432a, 461a, 465ar466a. Seaman remained blindfolded throughout the attack, R.R. 444a, 460a-461a. For the next few hours, the assailant attacked Seaman by dragging her by the hair, orally sodomizing her, punching her in the stomach, forcing cucumbers into her rectum,, and vaginally raping her. R.R. 436a-442a. He further tortured her by cutting the electric cord of a lamp, manually inserting it into her vagina, and electrocuting her genitals. R.R. 442a-444a, 697a-699a. He then lay down next to her on her bed for approximately forty-five minutes before once again forcing her to fellate him. R.R. 442a. At some point, he allegedly bit her on the back of her shoulder. R.R. 448a. After he finally left, she freed herself, ran into the hall, called for help, and was found by her neighbor, who called 911. R.R. 444a-445a. The Pennsylvania State Poliqe (“PSP”) processed the crime scene for fingerprints but did not find prints that could be used for comparison purposes. R.R. 661a, 666a, 702a. The PSP gathered physical evidence from the scene and from Seaman’s person, including a knife, the bedding upon which the rape and torture occurred, red hairs gathered from the bedding, Seaman’s clothing and her rape kit. R.R. 664a, 715-719a; Petition for Post' Conviction Relief and for DNA Testing (“Petition”), Ex. C, at 1-4. Seaman had not had sexual intercourse in the week prior to the assault. R.R. 713a-715a; Petition, Ex. C, at 2. The PSP turned over the rape kit evidence to the New Kensington Police Department (“NKPD”), which submitted the evidence to the PSP Greensburg Regional Laboratory on January 3,1991. Petition, Ex. C. at 2. While in the hospital, NKPD police photographed what they described as a bite mark on Seaman’s shoulder. The police neither used a scale to measure the size of the bite mark nor swabbed it to test for amylase, the main enzyme in saliva. R.R. 514a, 5l7a. During an interview at the hospital on the day of the rape, Seaman told Sergeant Charles Korman that she recognized her assailant’s voice as “a John that had previously worked [in her apartment building] as a maintenance man.” R.R. 448a, 451a, 484a. Seaman also noted the assailant was tall, had a beard, and wore a cap. R.R. 431a. That same day, Detective Frank Link interviewed Seaman about the perpetrator, but she did not identify Appellee as the assailant. R.R. 655a-656a, On December 18, 1990, Detective William Dlubak— who had never met or spoken to Appel-lee-visited Seaman in the hospital and performed a lisp for Seaman in an “imitation” of her attacker. During trial, Seaman rated the performance as a ten, but she only rated it as an eight during Appellee’s preliminary hearing. R.R. 468a-470a. Seaman later stated that she only began 'to believe the perpetrator was Appellee two days after the attack and after hearing the imitation of this lisp. R.R. 467a-468a, 471a; see also Brief in Support of Petition for Relief (“Post Hr’g Brief’), Exh. D, at 1. She also admitted that as far as she knew, Detective Dlubak was not known to make a living imitating people. R.R. 470a. She also stated that she had only spoken to Appellee “on one occasion” during which time “they [only] exchanged pleasantries.” Post Hr’g Br., Exh. D. In addition to Seaman’s alleged voice identification of Appellee, Katheryn Jef-fries, a neighbor of Appellee’s, told police during questioning that she overheard Ap-pellee make a sexually charged statement that hé “was into fruits and vegetables” at a Christmas party with neighbors weeks after the attack. R.R. 740a-741a, 745a-746a. Other individuals at the party denied this account. R.R. 778a-780a. This remark, the Commonwealth contended, supported its claim thiat Appellee sodomized Seaman with a cucumber. No physical evidence other than the alleged bite mark on Seaman’s shoulder, described below, tied Appellee to the scene. Although serological tests performed by the'Commonwealth did not detect sperm on any rape kit items, they detected blood consistent with Seaman’s blood in her fingernail scrapings, and-determined that hairs collected from the pubic and head hair combings' were consistent with Seaman. Petition, Ex. C, at 3-4. The reddish hairs found on Seaman’s white blanket and fitted sheet- did not match either Seaman’s or Appellee’s hair color; based on this information, Appellee was excluded as a contributor to these foreign hairs. R.R. 817a-818a; Petition, Ex. C at 3-4. No DNA testing was ever performed on any of these items. The Commonwealth retained Dr. Michael Sobel, a forensic odontologist, to examine the photograph of the alleged bite mark on Seaman’s shoulder. R.R. 525a. With no scale in the photo to measure Seaman’s injury, Dr. Sobel could not directly compare it to Appellee’s teeth. R.R. 527a. However, Dr. Sobel’s colleague, Dr. Thomas David, claimed the ability to use ultraviolet (“UV”) light techniques to “illuminate” bite mark injuries not visible to the naked eye. R.R. 527a-528a, 585a. On May 19, 1991 — five months after the attack — Drs. Sobel and David examined Seaman’s shoulder, which, by that time, had healed completely. Prior to the examination, the odontologists read the case file, including police reports narrating the torture Seaman had endured and identifying Appellee as the suspect. No visible injury existed at the time of their examination. R.R. 606a. Undeterred, the odontologists, through use of the UV light technique, purported to see marks that evidenced a “patterned injury that had two semicircular markings in it that showed irregular interruption.” R.R. 607a-608a. The odon-tologists placed hand drawn outlines of Appellee’s teeth over the UV light photograph and concluded that Appellee’s teeth created the bite mark impression, to the exclusion of all other potential sources. R.R. 562a, 611a, 637a-638a. At trial, both witnesses testified to a reasonable degree of dental certainty that Appellee’s teeth made, the bite mark on Seaman’s shoulder. R.R. 560a, 610a-611a, 637a-638a. Appellee provided an alibi for his whereabouts during the attack, testifying that he was home with his girlfriend with their newborn baby. R.R. 756a-761a. Appellee’s girlfriend testified that each time she woke up to feed the baby during the night, she saw Appellee sleeping. R.R. 773a-774a, 776a-778a. Matt Huet, Seaman’s landlord and Appellee’s former boss, testified that he spoke to Appellee by phone at the exact time of the attack. Huet provided hand written notes documenting his contemporaneously recorded observations of the content, date and' time of the call. Post Hr’g Brief, Exs. E-F. Appellee was arrested in January 1991 and charged with rape and other sexual offenses. During trial in July 1991, the parties presented the evidence summarized above. The jury found Appellee guilty of rape,[2] involuntary deviate sexual intercourse,[3] aggravated assault[4] and other misdemeanors, and he was sentenced to forty-five to ninety years’ imprisonment. Appellee’s judgment of sentence was affirmed on direct appeal. Over the next decade, Appellee unsuccessfully litigated a PCRA petition and a habeas coitus petition. In 2009, the PCRA court granted Ap-pellee’s motion for post-conviction DNA testing on the lamp cord used to torture Seaman. Cellmark Laboratories excluded Appellee as the contributor to the DNA found on the cord. Appellee moved for PCRA relief based on Cellmark’s report, but the PCRA court denied relief, noting that the other evidence against Appellee, including the bite mark evidence, Seaman’s voice identification of Appellee, and Appellee’s remark about “fruits and vegetables,” was compelling. On May 13, 2016, Appellee filed the petition presently under review, a petition for PCRA relief under 42 Pa.C.S. § 9543 and for DNA testing under 42 Pa.C.S. § 9543.1 on various items of collected evidence, including, inter alia, a white blanket upon which the attack occurred that the District Attorney’s Office located on November 10, 2015, a girdle used to cover Seaman’s face, and Seaman’s rape kit. Appellee contended that testing the evidence with advanced DNA technologies could, for the first time, detect semen, saliva, and/or skin cells and analyze hairs left by the assailant, potentially leading to the identification of a heretofore unknown male as the source of the biological materials. Appellee also requested a documented search of the laboratory, police evidence storage facilities, and the District Attorney’s Office for Seaman’s rape kit, clothing, and all other probative evidence last documented as being within the possession of the NKPD, PSP, and the PSP’s Greensburg Regional Laboratory. Attached to Appellee’s petition were two affidavits by Drs. Sobel and David, the two odontologists, who averred that they would no longer testify as they had at trial, because “[t]he scientific knowledge and understanding on which” their conclusions that Appellee was the biter rested had “changed significantly since they were given in 1991.” Petition, Ex. J, at ¶¶ 14,' 17, 18. “Today,” they averred, they “would not proffer such testimony, since it is inconsistent with the current ABFO [American Board of Forensic Odontology] Guidelines and with current scientific‘understanding of the limitations of bite mark comparisons.” Id. at ¶ 14. ' Oh November 28, 2016, the PCRA court convened an evidentiary hearing. Dr. David testified that in light of the change in scientific understanding reflected in the ABFO Guidelines, he “modified [his] linkage opinion of the bite mark to [Appellee], to wit, changing it from the highest level of certainty to cannot exclude.” R.R. 178a. Dr. David also testified that he could not opine how many people, in addition to Ap-pellee, could have made the mark, because “[y]ou don’t know how many people might be included in an open population.” R.R. 118a. Appellee proffered additional expert testimony from Dr. Adam Freemen, former ABFO President, and Dr. Cynthia Brzo-zowski, a member of ABFO’s board of directors. Both experts testified that Seaman’s injury could not be definitively categorized as a bite mark in the first instance; in their expert judgment, any further comparison, including stating that Appellee was one of an unknown (and unknowable) number of people who could have made the mark, would be scientifically unwarranted based on this evidence. Dr. Freeman testified: In the' absence of being told by the victim that she was bitten, this is probably a cáse where :.. [under] the old guidelines I would’ve said this is suggestive of a bite mark and surely would not have done a comparison. Or today, I would just say there’s not enough information for me to move forward to a comparison .... I can see no scientific validity in doing that because we have no idea how much that injury has healed. R. 277a, 279a. Dr. Brzozowski testified: So like most UV photographs, this is a very grainy image, and it lacks really any detail that would be needed to do a comparison to anybody’s teeth. If I were given this [UV] photograph or the colored photograph today by my law enforcement agency, and I was asked to evaluate it, I would say there is insufficient evidence or information to even determine that this is a human bite mark, and, therefore, I would not go further with any comparison. The fact that this was of an injury that healed over a five month period, there is no way for, to áecount for how that injury changed in any way as it healed over a five month period. There’s absolutely no way to take that into consideration. And then to do specific measurements from this and compare it to Appellee’s dentition is just not acceptable. R.R. 237-238a. On February 21, 2017, the PCRA court ordered DNA testing performed on the blanket, rape kit and Seaman’s underwear and girdle.[5] The court deferred any ruling on Appellee’s motion for new trial until after DNA testing. On March 3, 2017, the Commonwealth appealed to this. Court. Both the Commonwealth and the PCRA court complied with Pa.R.A.P. 1925, The Commonwealth raises the following issues in this appeal: I. Did the PCRA court err in finding that [Appellee] presented a prima facie case of actual innocence entitling him to DNA testing? II. Did the PCRA court err despite the Superior Court case of In Re Payne, 129 A.3d 546 ([Pa. Super.] 2015) [ (en lane) ] in applying a standard of a reasonable possibility that it would be more likely than not that no reasonable juror would have found [Appellee] guilty beyond a reasonable doubt while failing to consider the plain meaning of the words actual innocence in 42 Pa.C.S.[ ] § 9543.1? III. Did the PORA court err in finding that exculpatory results of DNA testing would establish [Appellee’s] actual innocence after a review of the trial record? IV.'Did the PCRA court err in reserving its ruling on the unrelated PCRA petition until after obtaining results of DNA testing? Commonwealth’s Brief at 3-4. Two preliminary observations are in order. First, Appellee’s motion for DNA testing was timely. Agreements to conduct DNA testing are exempt from the PCRA’s one-year jurisdictional time bar within section 9545(b)(1). See Commonwealth v. Conway, 14 A.3d 101, 108 n.2 (Pa. Super. 2011). Second, pursuant to Commonwealth v. Scarborough, 619 Pa. 353, 64 A.3d 602 (2013), we have jurisdiction to review the Commonwealth’s appeal from the order granting DNA testing. See id. at 609 (order granting DNA testing is final, appealable order because it brings proceedings ' under section 9543.1 “[to] an end”).[6] We address the Commonwealth’s first three issues together, because they all raise the same question: whether the evidence supported the PCRA court’s decision to order DNA testing under 42 Pa. C.S. § 9543.1. “Post conviction DNA testing falls under the aegis of the ... [PCRA], and thus, [o]ur standard of review permits us to consider only whether the PCRA court’s determination is supported by the evidence of record and whether it is free-from legal error.” Conway, 14 A.3d at 108 (citation, quotation marks and footnote omitted). This Court can affirm a PCRA court’s decision on a motion for post-conviction DNA testing if there is any basis to support it, even if this Court relies on different grounds to affirm. See Commonwealth v. Walsh, 125 A.3d 1248, 1253 (Pa. Super. 2015) (citation omitted). The DNA testing statute, section 9543.1(a), provides in relevant part: An individual convicted of a criminal offense in a court of this Commonwealth and serving a term of imprisonment ... may apply by making a written motion to the sentencing court for the performance of forensic DNA testing on specific evidence that is related to the investigation or prosecution that resulted in the judgment of conviction. 42 Pa.C.S. § 9543.1(a)(1). Within this motion, the applicant must: (3) present a prima fade case demonstrating that the: (i) identity of or the participation in the crime by the perpetrator was at issue in the proceedings that -resulted in the applicant’s conviction and sentencing; and (ii) DNA testing of the specific evi-dencé, assuming exculpatory results, would establish: (A) the applicant’s actual- innocence of the offense for which the applicant was convicted .... 42 Pa.C.S. § 9543.1(c)(3)(i)-(ii)(A). Section 9543.1(d) prescribes when the court must order DNA testing and when it must not: (1) Except as provided in paragraph (2), the court shall order the testing requested in a motion under subsection (a) ... upon a determination, after review of the record of the applicant’s trial, that the: (i) requirements of subsection (c) have been met; • (ii) evidence to be tested has been subject to a chain of custody sufficient to establish that it has not been altered in any material respect; and (iii) motion is made, in a timely manner and for the purpose of . demonstrating the applicant’s actual innocence and not to delay the execution of sentence or administration of justice. (2) The court shall not order the testing requested in a motion under subsection (a) if, after review of the record of the applicant’s trial, the court determines that there is no reasonable possibility that the testing would produce exculpatory evidence that: (i) would establish the applicant’s actual innocence of the offense for which the applicant was convicted[.] 42 Pa.C.S. § 9543.1(d) (emphases added). [0]n its face, the prima fade requirement.set forth in § 9543.1(c)(3) and reinforced in § 9543.1(d)(2) requires that an appellant demonstrate that there is a “reasonable possibility” that “favorable results of the requested DNA testing ‘would establish’ the appellant’s actual innocence of the crime of conviction.” The parties to this appeal agree, as did the trial court, that the definition of “actual innocence” that is to be applied in the evaluation of the effect of new evidence is that articulated by the United States Supreme Court in its [o]pinion in Schlup v. Delo, 513 U.S. 298, 327 [ ] (1995), namely, that the newly discovered evidence must make it “more likely than not that no reasonable juror would have found him guilty beyond a reasonable doubt.” Thus, this standard requires a reviewing court “to make a probabilistic determination about what reasonable, properly instructed jurors would do,” if presented with the new evidence. Id., 513 U.S. at 329 .... Conway, 14 A.3d at 109 (some citations and footnote omitted). Due to the questionable nature of the Commonwealth’s evidence, we think it more likely than not that reasonable jurors would find Appellee not guilty if the DNA tests on the blanket, rape kit and Seaman’s underwear/girdle are exculpatory. To begin with, DNA tests taken several years ago excluded Appellee as the contributor to DNA found on the lamp cord used to electrocute Seaman during the attack. Further, Appellee has demonstrated that the bite mark evidence, a crucial component of the Commonwealth’s trial evidence, is problematic, if not entirely incredible. During trial in 1991, two expert odontologists testified, to a reasonable degree of dental certainty, that Appellee’s teeth made the bite mark on Seaman’s shoulder. In 2016, however, these same experts submitted affidavits recanting their prior opinions due to groundbreaking changes in ABFO guidelines in March 2016.[7] One of these experts, Dr. David, testified before the PCRA court that his opinion changed from identifying Appellee as the biter to not being able to exclude Appellee — and countless other individuals in the open population — as the biter. Two other experts, a former ABFO President and a member of ABFO’s board of directors, testified that based on the photographs used by the experts during the 1991 trial, they could not even categorize the mark as a bite mark and would not have used the photographs for bite mark comparison. The final two pieces of evidence highlighted by the Commonwealth— Seaman’s voice identification of Appellee and Appellee’s “fruits and vegetables” remark — are relevant and probative but come nowhere close to overwhelming evidence of guilt. Since the Commonwealth’s case is not overwhelming, we think that the record supports the PCRA court’s order for DNA testing. We acknowledge that in DNA testing cases, a test that is favorable to the petitioner does not guarantee acquittal. “[A]n absence of evidence is not evidence of absence.” Commonwealth v. Heilman, 867 A.2d 542, 547 (Pa. Super. 2005); see also Commonwealth v. Williams, 35 A.3d 44, 51 (Pa. Super. 2011) (PCRA court properly denied DNA testing, where even if appellant’s DNA were not found on hat and wig, record contained “overwhelming” evidence of guilt, including three unshakable eyewitnesses, appellant s confession, and appellant s access to weapon used in crimes). Nevertheless, in sharp contrast to Williams, an exculpatory DNA test on one or more items referenced in the PCRA court’s order, in tandem with the other frailties in the Commonwealth’s case, may well result in Appellee’s acquittal. In its final argument, the Commonwealth argues that “to the extent that the [PCRA] court has reserved its ruling on the PCRA motion until after the results of DNA testing ... it would be error [for the PCRA court] to [decide] the unrelated PCRA motion on the results of the DNA testing.” Commonwealth’s Brief at 26. We refrain from addressing this issue because it is premature. As discussed above, the PCRA court has deferred its ruling on the PCRA petition until after the DNA test results. The proper time for the Commonwealth to raise this argument is on remand, following the test results. Order affirmed. Case remanded for proceedings in accordance with this opinion. Jurisdiction relinquished. , For the convenience of the parties, we cite to the reproduced record. .18Pa.C.S.§ 3121. .18 Pa.C.S. § 3123. .18 Pa.C.S. § 2702. . The Commonwealth appears to admit that it has "bedding,” Commonwealth’s Brief at 19, which we assume to mean that the Commonwealth has the blanket that the PCRA court ordered tested. The Commonwealth also states that Appellee "has requested testing of i other items, [but] the Commonwealth does not have those items. Therefore, they are not available for testing.” Id. at 19 n.2. We' assume this means that the Commonwealth does not have the rape kit and Seaman's underwear or girdle. We leave it to the PCRA court to determine on remand what the Commonwealth has and does not have and what effect, if any, the absence of items has on these proceedings. . The fact that PCRA proceedings have not concluded under section 9543 (and instead are deferred until the disposition of the present appeal) does not affect the finality of the order granting DNA testing under section 9543.1.' For example, in Scarborough, the PCRA court granted DNA testing, and the Commonwealth appealed, one year before the PCRA court denied Scarborough’s petition for relief under section 9543. See Commonwealth v. Scarborough, 1538 MDA 2009 (Commonwealth's appeal under section 9543.1 filed September 2, 2009); Commonwealth v. Scarborough, 1931 MDA 2010 (Scarborough's appeal under section 9543 filed November 29, 2010). Our Supreme Court held under these circumstances that the order granting DNA testing was final and appealable. Scarborough, 64 A.3d at 610. We infer from this history that the Commonwealth has the right to appeal an order granting DNA testing under section 9543,1 even though PCRA proceedings under section 9543 remain pending. . Before the PCRA court, the Commonwealth argued at length that the new ABFO guidelines "are not a new fact but a new opinion” and therefore does not constitute newly discovered evidence that warrants PCRA relief. Commonwealth's Brief In Opposition To Defendant’s Motion For Post-Conviction Relief And Motion For DNA Testing, at 3-9. In this appeal, however, the Commonwealth has not only abandoned this argument but also completely ignores the evidence presented by Appellee during the PCRA hearing. See Commonwealth's Brief at 11-27. The Commonwealth limits its focus to the trial evidence, with particular emphasis on the now discredited bite mark evidence. Id.