J-S41017-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| BRANDON BLOSS | : | |
| | : | |
| Appellant | : | No. 44 EDA 2025 |

Appeal from the PCRA Order Entered December 3, 2024
In the Court of Common Pleas of Northampton County Criminal Division
at No(s):  CP-48-CR-0003256-2000

BEFORE:   BOWES, J., BECK, J., and FORD ELLIOTT, P.J.E.[*]

MEMORANDUM BY BECK, J.:                       **FILED FEBRUARY 20, 2026**

Brandon Bloss ("Bloss") appeals from the order entered by the Northampton County Court of Common Pleas dismissing his second petition pursuant to the Post Conviction Relief Act ("PCRA").[1]  Because Bloss filed an untimely PCRA petition and failed to establish an exception to the statutory time bar, we affirm.

A prior panel of this Court summarized the facts and procedural history of this case as follows:

> Despite being married to [Bloss], Michelle Hetzel (Hetzel) was involved in a sexual relationship with the victim, a 19[-]year-old woman, Devon Guzman ([Guzman]).  Bloss was aware of the women's relationship and was angry about the attention and money Hetzel expended on [Guzman].  He was contemplating

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1]  42 Pa.C.S. §§ 9541-9546.

divorce. [Guzman] simultaneously was involved in a relationship with another woman named Keary Renner (Renner), with whom she lived. Hetzel, Renner[,] and [Guzman] were high school friends. Although [Guzman] and Renner lived together, [Guzman] met with Hetzel on a regular basis. …

On the night of June 14, 2000, Hetzel and [Guzman] were at [Guzman's father's home] with him, his girlfriend[,] and his sister. Everyone was drinking alcohol. Hetzel and [Guzman] had just returned from a vacation in Puerto Rico, where they had exchanged rings. Hetzel paid for the trip. At some point the two women began arguing. Apparently, Hetzel was upset that [Guzman] had not moved out of Renner's residence and did not intend to do so. The women ultimately left [the] house, each departing in her own car.

When [Guzman] arrived home, she told Renner that Hetzel had proposed to her, but that she had broken up with Hetzel and returned the rings Hetzel had given her. Renner noticed that [Guzman] had been drinking and the women argued about Hetzel. They began a physical fight, but were interrupted by a series of pages from Hetzel's home. [Guzman] called Hetzel's number and spoke with Bloss. Renner could hear Bloss speaking to [Guzman] and Hetzel screaming in the background. After the call, [Guzman] informed Renner that Hetzel was sick and needed her attention. Renner insisted on accompanying [Guzman] to Hetzel's home. When the women arrived at Hetzel's [home,] Renner stayed in the car and heard Bloss tell [Guzman] at the doorway that Renner would have to leave because Hetzel did not want her there. [Guzman] came back to the car and told Renner that she was taking her home and would return to Hetzel's house. A neighbor saw [Guzman] at the doorway and watched as she approached the car, banged on the hood, and told her passenger that she was taking her home.

[Guzman] dropped Renner at their home at approximately 11:30 PM, told her there was nothing to worry about and explained that she would be back soon. Over an hour later, at approximately 12:45 AM, Renner received a call from Hetzel who told her that [Guzman] had never returned to Hetzel's home. At 2:30 AM, Hetzel arrived at Renner's residence with Bloss. Bloss stayed in the car while Hetzel and Renner talked about [Guzman]'s disappearance. Hetzel asked Renner to call the police and report [Guzman] as a missing person, but Renner refused to do so

because [Guzman] left before but she always came home. Hetzel then called the Forks Township Police Department and reported [Guzman] as missing. After giving a description of [Guzman] to police, the women called some friends and family members in an effort to find [Guzman]. Several times, Hetzel called police to learn whether they located [Guzman]. Hetzel left Renner's place at about 6:30 AM.

Later that morning, Hetzel returned to Renner's residence with food and suggested that the women drive around Easton looking for [Guzman]'s car. At some point, Hetzel suggested they search Canal Park, a place she and [Guzman] often visited together. At the park, they saw [Guzman]'s car. Inside the car they discovered [Guzman]. She was covered with a green jacket and lying across the backseat with her back toward the front seat. With assistance from a city employee, police were summoned. On their arrival, they detected no signs of life from [Guzman] and called the coroner.

The Coroner removed the green jacket from atop [Guzman]'s body and saw that [her] throat had been cut and she had a "massive gaping laceration" to her neck. The wound was a four inch long cut that went almost to her spine; it severed [her] tongue and cut in half the right carotid artery and the right jugular vein. Also found on the body was a syringe containing a clear liquid. There was no cap on the syringe. Police interviewed Hetzel at the scene and Bloss later that same day.

After their interviews with police and for a period of about six weeks, Hetzel and Bloss continued their marriage. Hetzel announced to family and friends that she was pregnant with twins, an assertion that was not true. The couple also took a vacation to Mexico together. Meanwhile, the police investigation focused on Hetzel and Bloss. Hetzel's car was searched, as was the home she and Bloss shared. The searches yielded a number of items of physical evidence. From the trunk of Hetzel's car police recovered two pairs of rubber gloves, Bloss' t-shirt[,] and a pair of jeans with blood that was consistent with [Guzman]'s blood, and Bloss' sweatshirt, socks and sneakers, all of which had indications of human blood, but were too weak for further testing. At the couple's home on the day after the murder, police found a pair of Hetzel's jeans soaking in the washing machine. There were no other items in the washer and the tub was filled with soapy water. In a presumptive test, the water tested positive for blood. In the

pocket of Hetzel's jeans was a syringe cap that matched the open syringe found on [Guzman]'s body.

Police also recovered physical evidence from [Guzman]'s body and her car. On the green jacket that covered her were hairs consistent with Hetzel's hair. In the car were hairs consistent with Bloss' hair. [Guzman]'s pager was not clipped to her pants as Renner described last seeing it; it was found unclipped under the waistband of her pants. Police seized telephone records from the Hetzel/Bloss residence and learned that there had been numerous calls from that address to [Guzman]'s pager on the night of the murder. However, all … those calls had been erased on the pager.

Police examination of trash set out by Hetzel and Bloss revealed numerous bandages, one of which appeared to have the pattern of a bite mark on it. Police sought and received a warrant authorizing them to photograph Bloss and the photographs that were taken revealed an injury on Bloss' left forearm. A forensic ondologist concluded that the injury was a human bite mark that was consistent with [Guzman]'s dental records.

Hetzel and Bloss were charged with first[-]degree murder and despite Hetzel's effort to sever the cases, they were tried jointly. …

* * *

The jury found both [Hetzel and Bloss] guilty of first-degree murder and[, on October 5, 2001,] they were sentenced to life in prison.

**Commonwealth v. Bloss**, 247 EDA 2006, at 1-4 (Pa. Super. Nov. 15, 2006) (non-precedential decision) (cleaned up).

On March 14, 2003, this Court affirmed Bloss' judgment of sentence. On December 2, 2003, the Supreme Court of Pennsylvania denied his petition for allowance of appeal. **Commonwealth v. Bloss**, 839 A.2d 350 (Pa. 2003).

On December 1, 2004, Bloss filed a timely PCRA petition in which he asserted that his trial counsel was ineffective for failing to call character

witnesses on his behalf. ***Bloss***, 247 EDA 2006, at 5. The PCRA court ultimately denied the petition. This Court affirmed the denial of Bloss' first PCRA petition on November 15, 2006. ***See id.*** at 12.

On December 15, 2012, Bloss filed the instant PCRA petition, his second. In an attempt to satisfy the newly-discovered fact exception to the PCRA's time bar, Bloss alleged that on, October 17, 2012, he viewed an episode of the Public Broadcasting System series "Forensics on Trial" that questioned the reliability of forensic evidence in criminal cases, including bite mark evidence. ***See*** PCRA Petition, 12/20/2012, ¶ 15. Bloss subsequently retained private counsel. On April 1, 2013, Bloss filed an amended PCRA petition in which he further averred that in the intervening months, he became aware that Headline News Network aired an episode of "Forensic Files" in February 2013 that was specifically about Bloss' case. ***See*** Amended PCRA Petition, 4/1/2013, ¶ 9(a)(7). He claimed that he was entitled to PCRA relief because his conviction was based on bite mark evidence that the scientific community has now deemed unreliable. ***See id.*** ¶ 9(b). On August 22, 2022, the PCRA court held hearing on Bloss' petition.[2]

---

[2] The record is unclear as to reason for the extended delay in resolving Bloss' PCRA petition, though the PCRA court cites "numerous continuance requests." PCRA Court Opinion, 12/3/2024, a 5.

On December 3, 2024, the PCRA court denied Bloss' PCRA petition. This timely appeal followed. Bloss presents the following issues, claiming PCRA court error by:

A. Failing to recognize that the forensic odontologist's admission that he had never conducted a bite[-]mark comparison using dental impressions from an exhumed body, and was not aware of anyone else in his profession having done so, implicated the admissibility of his expert testimony under Pa.R.E. 702;

B. Incorrectly concluding that Bloss had admitted at trial and in prior PCRA proceedings that the victim had bitten him, and that the forensic odontologist's testimony was accurate, where Bloss did not testify at trial, and admitted only that his prior PCRA petitions had not challenged the forensic odontologist's opinions, contested the source of the bite mark, or denied that the blood on his clothing had come from the victim; and

C. Since the PCRA court and counsel had agreed that the sole issue before the court was the timeliness of the PCRA filing, the PCRA court erred by failing to limit its analysis to the jurisdictional issue of timeliness, i.e.[,] whether (1) the facts upon which the PCRA claim is based were unknown to Bloss and (2) if they were unknown, the facts could have been ascertained by the exercise of due diligence.

Bloss' Brief at 4. We address Bloss' issues together, as they are related.

"We review the denial of PCRA relief by examining whether the PCRA court's conclusions are supported by the record and free from legal error." *Commonwealth v. Johnson*, 289 A.3d 959, 979 (Pa. 2023). "[W]e defer to the factual findings of the post-conviction court, which is tasked with hearing the evidence and assessing credibility." *Id.* Our standard of review of a PCRA court's legal conclusions, however, is de novo. *Id.*

The threshold question we must address is the timeliness of Bloss' second PCRA petition and whether he satisfied an exception to the statutory time bar. **See Commonwealth v. Brown**, 141 A.3d 491, 499 (Pa. Super. 2016) ("Crucial to the determination of any PCRA appeal is the timeliness of the underlying petition. Thus, we must first determine whether the instant PCRA petition was timely filed.") (quotation marks and citation omitted). "The timeliness requirement for PCRA petitions is mandatory and jurisdictional in nature, and the court may not ignore it in order to reach the merits of the petition." **Id.** (quotation marks and citation omitted); **see also Commonwealth v. Fantauzzi**, 275 A.3d 986, 994 (Pa. Super. 2022) ("the timeliness of a PCRA petition is jurisdictional and [] if the petition is untimely, courts lack jurisdiction over the petition and cannot grant relief"). The timeliness of a PCRA petition is a question of law, which we review de novo. **Commonwealth v. Callahan**, 101 A.3d 118, 121 (Pa. Super. 2014).

The PCRA sets forth the following mandates governing the timeliness of any PCRA petition:

(1) Any petition under this subchapter, including a second or subsequent petition, shall be filed within one year of the date the judgment becomes final, unless the petition alleges and the petitioner proves that:

(i) the failure to raise the claim previously was the result of interference by government officials with the presentation of the claim in violation of the Constitution or laws of this Commonwealth or the Constitution or laws of the United States;

(ii) the facts upon which the claim is predicated were unknown to the petitioner and could not have been ascertained by the exercise of due diligence; or

(iii) the right asserted is a constitutional right that was recognized by the Supreme Court of the United States or the Supreme Court of Pennsylvania after the time period provided in this section and has been held by that court to apply retroactively.

42 Pa.C.S. § 9545(b)(1). A petitioner must file a petition invoking one of these exceptions "within 60 days of the date the claim could have been presented." *Id.* § 9545(b)(2) (effective until Dec. 24, 2018).[3]

Because this Court affirmed his judgment of sentence on March 14, 2003, our Supreme Court denied his petition for allowance of appeal on December 2, 2003, and he did not file a further appeal from that decision, Bloss' judgment of sentence became final on March 2, 2004, following the expiration of the ninety-day period for filing a petition for writ of certiorari with the United States Supreme Court. *See* 42 Pa.C.S. § 9545(b)(3); S. Ct. R. 13.1 (allowing 90 days to petition for certiorari). Bloss therefore had one year from that date to file a timely PCRA petition. *See* 42 Pa.C.S. § 9545(b)(1).

_____

[3] The General Assembly amended section 9545(b)(2) on October 24, 2018, effective December 24, 2018, extending the time for filing from sixty days of the date the claim could have been first presented to one year. The amendment applies to claims arising on or after December 24, 2017. *See* Act of Oct. 24, 2018, P.L. 894, No. 146, § 3. Bloss filed his second PCRA petition on December 15, 2012, and the sixty-day deadline therefore applied to his PCRA petition.

As he did not file the instant petition until December 15, 2012, it is facially untimely–a determination he does not contest. ***See*** Bloss' Brief at 7-8.

Instead, Bloss argues that he has satisfied the newly-discovered fact exception to the time bar. ***See*** Bloss' Brief at 14-25. He asserts that the episodes of "Forensics on Trial" and "Forensic Files" that he viewed in 2012 and 2013, respectively, demonstrate a "marked shift in the community of forensic odontologists about the validity of bite mark evidence" and that the "principles on which this technique is based are now in doubt." ***Id.*** at 15-16. Specifically, Bloss takes issue with the trial testimony of forensic odontologist, Dr. Richard Scanlon, who testified at his trial that the bite mark on Bloss' forearm belonged to Guzman, claiming the shows he viewed revealed Dr. Scanlon's techniques to be flawed. ***Id.*** at 19. Bloss asserts that Dr. Scanlon "used an untried and unorthodox technique—obtaining the dental impression of a deceased, exhumed victim—to undertake this analysis," as Dr. Scanlon stated in his interview on "Forensic Files" that he was not aware of anyone having ever before exhuming a body to take dental impressions. ***Id.*** Bloss also points to a statement by Jessica Gabel, a professor at Georgia State University College of Law, that, "[f]orensic bite mark evidence is more art than science." ***Id.*** at 6-7. He contends that the PCRA court therefore failed to recognize that his conviction arose, in large part, from flawed science. ***Id.*** at 22. He therefore seeks the opportunity to reexamine whether his conviction was, in fact, the result of the purportedly faulty science. ***Id.*** at 23. He further

asserts that the PCRA court's finding that he previously admitted that Guzman had bitten him was not supported by the record. *Id.* at 25-27.

In support of his newly-discovered facts claim, Bloss relies on this Court's decision in *Commonwealth v. Kunco*, 173 A.3d 817 (Pa. Super. 2017), our non-precedential decision in *Commonwealth v. Ross*, 1738 WDA 2018, 2019 WL 6211324 (Pa. Super. filed Nov. 21, 2019) (non-precedential decision),[4] and our Supreme Court's decision in *Commonwealth v. Chmiel*, 173 A.3d 617 (Pa. 2017). In *Kunco*, a jury found Kunco guilty of rape and related offenses. At his trial, the only physical evidence the Commonwealth presented that linked Kunco to the crimes was the testimony of two forensic odontologists who testified, to a reasonable degree of dental certainty, that Kunco's teeth made a bite mark on the victim's shoulder. *Kunco*, 173 A.3d at 819-21. Notably, at the time the odontologists examined the victim's injury, there was no visible injury on her, and they used an ultraviolet light to see the purported bite marks. *Id.* at 820. In May 2016, Kunco filed a PCRA petition for DNA testing under 42 Pa.C.S. § 9543.1 on various items police collected from the victim's apartment. *Id.* at 820-21. Attached to the petition were two affidavits from the forensic odontologists who testified at Kunco's trial in which they averred that they would no longer testify as they had at trial because of significant changes in the science underlying bite mark

_____

[4] *See* Pa.R.A.P. 126(b) (stating we may rely on unpublished memoranda decisions of this Court filed after May 1, 2019 for their persuasive value).

analysis and that their testimony in 1991 was inconsistent with current American Board of Forensic Odontology guidelines. *Id.* at 821. Kunco also presented additional evidence challenging the validity of the bite mark analyses in his case, including the testimony of two experts who concluded that they would not have conducted a bite mark analysis in his case because it was difficult to categorize the victim's injury as a bite because of how much the injury had healed. *Id.*

The PCRA court granted Kunco's request for DNA testing. *Id.* at 822. On appeal to this Court, the Commonwealth challenged the PCRA court's decision to order DNA testing. *Id.* at 823. This Court affirmed, explaining that section 9543.1 "requires that [a petitioner] demonstrate that there is a reasonable possibility that favorable results of the requested DNA testing would establish the [petitioner]'s actual innocence of the crime of conviction." *Id.* at 823 (quotation marks and citation omitted). With respect to the bite mark evidence, we determined that Kunco demonstrated that the bite mark evidence, "a crucial component of the Commonwealth's trial evidence, [was] problematic, if not entirely incredible." *Id.* at 824. We therefore concluded that because of "the questionable nature of the Commonwealth's evidence, we think it more likely than not that reasonable jurors would find [Kunco] not guilty if the DNA tests … are exculpatory." *Id.*

While *Kunco* does point to a dispute within the scientific community regarding bite mark analysis, it is nonetheless distinguishable from this case.

First, **Kunco** is not a newly-discovered fact case, but rather a request for DNA testing under the PCRA. **See id.** at 819-24. Second, the bite mark analysis method the odontologists utilized in **Kunco**—i.e., the use of ultraviolet light to observe a purported bite mark that has healed—was not utilized by the odontologist in this case. **See id.** at 820. Third, the odontologists in **Kunco** expressly recanted their trial testimony, while no such recantation has occurred in this case. **See id.** at 821. Finally, Kunco presented the testimony of two additional experts attacking the specific methods employed by the odontologists in his case and Bloss presented no such evidence here. **See id.** We therefore find Bloss' reliance on **Kunco** unavailing.

In **Ross**, Ross challenged the trial court's denial of his request for a **Frye**[5] hearing on the admissibility of the Commonwealth's bite mark evidence. **Ross**, 2019 WL 6211324, at *2. We observed that **Frye** "applies to determine if the relevant scientific community has generally accepted the principles and methodology" that an expert employs and is "intended to prevent a party from introducing scientific evidence that was so new that it would be impossible to produce rebuttal experts[] equally conversant with the mechanics and methods of a particular technique." **Id.** at *3 (quotation marks and citation omitted).

---

[5] **Frye v. U.S.**, 293 F. 1013 (D.C. Cir. 1923). A **Frye** hearing is held by the trial court to determine whether a "scientific community has reached a general acceptance of the principles and methodology used by the expert witness." **Commonwealth v. Walker**, 92 A.3d 766, 769 n.1 (Pa. 2014).

Upon review, this Court determined that the trial court abused its discretion in denying Ross' request for a *Frye* hearing. *Id.* at \*7. First, we explained that Ross had "offered evidence indicating that there is a lack of consensus among forensic odontologists on whether bite mark identification analysis is reliable and valid." *Id.* at \*6. In support of this contention, Ross presented evidence from Dr. David Senn, DDS, Vice President of the American Board of Forensic Odontology, who opined that "[t]he uniqueness of the human dentition has not been scientifically established" and that "Forensic Odontology certifying organizations have not created or administered bite mark analysis proficiency tests for their board[-]certified members." *Id.* (citations omitted). Ross also presented a report from the President's Council of Advisors on Science and Technology, which suggested "that forensic odontologists do not consistently agree even on whether an injury is a human bitemark at all." *Id.* We also noted that "bite mark identification analysis not only involves concepts relating to forensic science generally, but also pathology, biology, statistics, and metrology." *Id.* at \*7. We therefore reasoned that Ross had "provided the trial court with articulable grounds that the Commonwealth's expert witnesses on bite mark identification analysis [had] not applied accepted scientific methodology in reaching their conclusions." *Id.*

We emphasized, however,

that our decision in no way represents a determination as to the general acceptance of the methodology underlying bite mark

- 13 -

identification analysis utilized by the Commonwealth's experts in this case. We make no judgment as to the admissibility of the bite mark identification evidence at issue. Rather, we simply conclude that [Ross] provided the trial court with articulable grounds to believe that the Commonwealth's expert witnesses on bite mark identification analysis may not have applied generally accepted scientific methodology in reaching their conclusions, and consequently, the trial court erred in concluding that a *Frye* hearing was not necessary. While [Ross]'s evidence expresses negative opinions on bite mark identification analysis, we cite it only to support our conclusion that a *Frye* hearing is proper for the resolution of these discrepancies, and to afford both parties the opportunity to present evidence in support of their positions.

*Id.*

Thus, while Bloss asserts that *Ross* constitutes "a judicial recognition that bite mark evidence is no longer scientifically unassailable[,]" Bloss' Brief at 19, *Ross* expressly states otherwise. *Id.* Instead, the *Ross* decision was based entirely on the evidence and witness testimony Ross presented before the court, which included expert testimony in support of his position that the bite mark evidence that was presented by the Commonwealth's expert in his case was not based upon a scientifically accepted methodology. *Id.*

In *Chmiel*, the final case relied upon by Bloss, Chmiel filed a facially untimely PCRA petition and asserted that his conviction and death sentence rested upon unreliable microscopic hair comparison evidence. *Chmiel*, 173 A.3d at 620. In support of his newly-discovered fact argument to overcome the timeliness requirement, Chmiel relied on a recent FBI press release and accompanying newspaper article about the inaccuracies of microscopic hair comparison evidence. *Id.* at 621. The PCRA court determined that the FBI

press release merely referred to facts that had been public knowledge and in the public domain since 1974, as questions surrounding microscopic hair comparison analysis had existed since that time, and as such, could not be considered "new" for purposes of satisfying the timeliness exception. *Id.* at 623.

On review, our Supreme Court reversed the PCRA court's decision and explained:

> There are two newly discovered facts upon which Chmiel's underlying claim is predicated[.] First, the FBI publicly admitted that the testimony and statements provided by its analysts about microscopic hair comparison analysis were erroneous in the vast majority of cases. The FBI's revelation reverberated throughout the country, marking a "watershed in one of the country's largest forensic scandals," … precisely because it constituted a public admission by the government agency that had propounded the widespread use of such scientifically flawed testimony. The revelation was the first time the FBI acknowledged that its microscopic hair analysts committed widespread, systemic error by grossly exaggerating the significance of their data in criminal trials. … Second, the FBI press release included the revelation that the FBI had trained many state and local analysts to provide the same scientifically flawed opinions in state criminal trials.

*Id.* at 625 (citations omitted).

The Court therefore reasoned that "the newly[-]discovered facts are the FBI's admissions, as the proponent of microscopic hair analysis, that its examiners gave flawed and scientifically unsupportable testimony, and spread its flawed methodology to state and local analysts." *Id.* at 626. Thus, the Supreme Court concluded that "[i]t is this concession, not the suspected unreliability of the forensic evidence as developed through scientific

- 15 -

advancements, that triggers the sixty-day window within which Chmiel was required to file his claim." ***Id.***

In finding that Bloss failed to satisfy the newly-discovered fact exception to the PCRA's time bar, the PCRA court distinguished ***Chmiel***. It explained that his purported new facts relating to the reliability of bite mark evidence are not comparable to "the FBI's public admission to utilizing inherently flawed scientific methods and propagating its use among state and local officials in criminal trials found in ***Chmiel***." PCRA Court Opinion, 12/3/2024, at 10-11. The court further explained that "[t]he statements relied upon by [Bloss] contain little to no scientific data, facts, or admissions of unreliability that could trigger the sixty-day window" for the filing of a PCRA petition. ***Id.*** at 11.

In so concluding, the PCRA court relied on our decision in ***Commonwealth v. Howard***, 285 A.3d 652 (Pa. Super. 2022). In that case, Howard asserted that the contents of a report by the Joint State Government Commission ("JSGC") following its study on capital punishment in Pennsylvania constituted new facts that satisfied the PCRA's time bar. ***Id.*** at 656. Specifically, the report revealed that racial disparities in jury selection pervasively and persistently infected the Commonwealth's capital prosecutions because the death qualification process systematically eliminated jurors who belong to certain social and demographic groups. ***Id.*** 658-59. The PCRA court denied the petition. ***Id.*** at 656.

- 16 -

On appeal, this Court affirmed, differentiating **Chmiel** in that there, the Supreme Court found that an FBI press release constituted newly discovered facts because it included a public admission of widespread, systemic error in the use of microscopic hair comparison analysis. **Id.** at 669. This admission, we explained, provided a "concrete link" to the flawed evidence presented at Chmiel's trial, as the FBI's admission called into question "virtually every case in which hair analysis was presented." **Id.** In contrast, the JSGC report in Howard's case did not contain any analogous admissions of error, nor did it contain "an admission of a systemic error that **necessarily** impacted or was **likely** to have affected [Howard]'s conviction." **Id.** at 670 (emphasis in original). Instead, we determined that the JSGC report contained unverified conclusions from an independent researcher, "based on research and statistics neither discussed nor revealed in the report," which suggested that the death qualification process potentially results in biased juries, rather than providing concrete evidence of systemic error relating to jury selection in capital cases or actual error that occurred in Howard's case. **Id.** We therefore concluded that the JSGC report did not satisfy the newly-discovered fact exception. **Id.** at 671.

The information upon which Bloss relies is a far cry from that which was presented in **Chmiel**, and even less compelling than what was put forth in **Howard**. Bloss has failed to point to any admissions by any government or prosecutorial bodies, or any other evidence, indicating systemic error relating

to bite mark evidence like the FBI's admissions regarding microscopic hair comparison analyses in ***Chmiel***. ***See Chmiel***, 173 A.3d at 625. The primary information from the television shows upon which Bloss relies is the fact that Dr. Scanlon stated that this was the first time he could recall exhuming a victim's body to obtain their dental impressions, and Professor Gabel's statement that "[f]orensic bite mark evidence is more art than science." ***See*** Bloss' Brief at 19-20.

The "new fact" Bloss attempts to rely upon is that the bite mark analysis utilized by Dr. Scanlon was based upon flawed science. But nothing in his presentation to the PCRA court (or on appeal) established this fact. While Dr. Scanlon stated during his interview that he was the first in the field to exhume a body for bite mark identification, at no time did he (or anyone else) say that this was not good science. ***See*** N.T., 8/22/2022, Def. Ex. 7. To the contrary, Bloss presented no witnesses, let alone experts in the field, to support his claim that subsequent to his trial, the science relied upon was in any way abandoned or disproven. In other words, while exhuming Guzman's body may have been a novel approach at the time, Bloss identified no evidence indicating that such methods are not accepted within the relevant scientific community or that this science is unreliable. Indeed, nothing in the episodes of "Forensics on Trial" or "Forensic Files" reveals that Dr. Scanlon's approach in this case is unaccepted within the scientific community or has been found to produce

unreliable results. *See* N.T., 8/22/2022, Def. Exs. 1-2, 7. This omission eliminates any persuasive value *Ross* may have had on this case.

Professor Gabel's statement in the "Forensics on Trial" program likewise represents nothing more than her opinion on bite marks analyses. As stated, Bloss directs us to her statement that "[f]orensic bite-mark evidence is more art than it is science," which she further qualifies by stating, "[t]here is a lot of varied interpretation that goes into that." N.T., 8/22/2022, Def. Exs. 1-2. Although "Forensics on Trial" discusses a case where bite mark evidence led to a false conviction (not Bloss' case), no one on that show stated that bite mark identification analysis was inherently flawed or that the method utilized by Dr. Scanlon in this case was not reliable. *See id.*

Unlike the petitioners in *Chmiel*, *Kunko*, and *Ross*, there was nothing in Bloss' presentation before the PCRA court to support a finding that the scientific evidence used at his trial is unreliable or flawed. While it is possible that such evidence may exist, Bloss failed to present any such evidence to the PCRA court.[6]

In short, while the television shows may have triggered Bloss to investigate whether the science used at his trial was flawed, they did not

_____

[6] Bloss references a 2009 report from the National Academy on Science, which he claims casts doubt on the reliability of bite mark analysis. *See* Bloss' Brief at 7. Our review of the record, however, shows that it contains no such report, and that it was never presented to the PCRA court for admission to the record.

establish this "fact." Bloss was required to plead **and prove** a fact of consequence to his conviction was previously unknown and could not have been discovered by the exercise of due diligence. **See** 42 Pa.C.S. § 9545(b)(1). Here, he has presented no new fact that is of any consequence to his case. Like the petitioner in **Howard**, the television programs contained no "admission of a systemic error that necessarily impacted or was likely to have affected" Bloss' conviction, and were instead simply individual opinions and statements about bite mark identification unsupported by testimony or scientific evidence. **See Howard**, 285 A.3d at 670-71 (emphasis omitted).

Accordingly, based on the foregoing, we conclude that the PCRA court did not err in determining that Bloss failed to establish the newly-discovered fact exception to the PCRA's time bar.[7]

Order affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 2/20/2026

---

[7] As we have determined that Bloss has failed to successfully plead and prove the newly-discovered fact exception to the PCRA's time limitation, we need not address his remaining arguments.